*Ex parte* NELLIE SMITH AND  
*Ex parte* ANNIE KEATING. } UPON HABEAS CORPUS.

CONSTITUTIONAL LAW.—Legislative enactments, or municipal ordinances, "to prohibit noisy amusements and to prevent immorality," are not repugnant to the Constitution of the United States, nor to the Constitution of the State.

IDEM—Laws intended to regulate the enjoyment of the natural rights of persons, do not impair, but foster and promote those rights, and to provide such laws is the essential object and purpose of Government.

CONSTITUTIONAL CONSTRUCTION.—By the provision of the Constitution of the State, that "every law of a general nature shall have a uniform operation," is meant, that the Legislature shall not grant to any citizen or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens.

LEGISLATIVE DUTY AND POWER.—Wherever wrong is found, the Legislature is allowed and required to provide an adequate remedy, and they may confine the operation of the remedy to the locality where the wrong exists, and its application to the persons by whom the wrong or evil is wrought; and in that, and every other instance, they are to look to the nature of the case and the adequacy of the remedy.

*Jones & Carey,* and *G. S. Brown,* for the Writs.

*S. Solon Hall,* against them.

SANDERSON, J., delivered the following opinion:

The return of the officer to whom these writs were directed, shows that the petitioners are in his custody by virtue of final process, issued from the Police Court of the City of Sacramento, which process is set out in full in the return, and shows that the petitioners have been convicted in that Court of the violation of a city ordinance, entitled "Ordinance No. 91, to prohibit noisy amusements and to prevent immorality," and sentenced to pay a fine of ten dollars each, and, in default of payment, to be imprisoned for the space of five days in the city prison.

On the part of the petitioners, a discharge from custody is claimed, upon the ground that the ordinance under which they were convicted, is repugnant to the Constitution of this

State, and to the Constitution of the United States, and is, therefore, null and void.    The ordinance reads as follows :

"ORDINANCE No. 91.—To prohibit noisy amusements and to prevent immorality.    Passed May 11, 1868.

"The Board of Trustees of the City of Sacramento ordain as follows :

"SECTION 1. It shall be unlawful within the city, in the night time, after twelve o'clock midnight, for any person to play or make a noise upon any musical instrument in any drinking saloon, or beer cellar, or to permit or allow the same by the proprietor, agent or manager thereof.

" SEC. 2. It shall be unlawful for any female person, in the night time, after twelve o'clock midnight, to be in any public drinking saloon, beer cellar or billiard room within said city, where vinous, malt or spirituous liquors are sold or given away, to be drank on the premises."

These two sections constitute the entire ordinance.    But by a statute of the State, every violation of a city ordinance of the City of Sacramento, is declared to be "a misdemeanor or public offense" (Statutes 1863–4, p. 295); and by still another statute of the State, it is provided that "misdemeanors for which no punishment is specially prescribed," shall be punished by fine not exceeding $500, or imprisonment not exceeding six months.    (Statutes 1850, p. 229, Sec. 143.)

It is claimed, *First*—That this ordinance is repugnant to the first section of the first article of the Constitution of this State, which reads as follows :    "All men are by nature free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining safety and happiness."

*Second*—That it is repugnant to the eleventh section of the first article of the Constitution of this State, which reads as follows :    "All laws of a general nature shall have a uniform operation."

*Third*—That it is repugnant to the first section of the fourteenth article of the amendments to the Constitution of the United States, which reads as follows :    "All persons born or naturalized in the United States, and subject to the

jurisdiction thereof, are citizens of the United States, and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

*First*—I am unable to perceive how this ordinance can be considered as injuriously affecting, in a constitutional sense, the natural rights of persons as enumerated in the first section of the first article of the Constitution of this State. Those rights are: First—The enjoyment and defense of life and liberty; Second—Acquiring, possessing and protecting property; and, Third—Pursuing and obtaining safety and happiness. It is true that, in a certain sense, it may be said that the ordinance interferes with the enjoyment of life and liberty, if it be *enjoyment* to a female to be in a drinking saloon, beer cellar or billiard room, where vinous, malt or spirituous liquors are sold or given away, to be drank upon the premises after twelve o'clock at night. In the same sense, it may be said to interfere with the acquisition of property, or the pursuit of business, if, as contended, it is to be construed as prohibiting female proprietors of drinking saloons, beer cellars and billiard rooms, who manage and conduct the business in person, or by the help of female servants, from keeping them open after midnight. In the same sense, it may interfere with the pursuit of happiness, if it be *happiness* for a female to be at the places mentioned after midnight. But it never has been considered that this article of the Constitution was designed to prohibit the Legislature, or the law-makers of a municipal corporation, from *all* interference with the rights therein enumerated. A construction to that effect would defeat the very ends and objects of the social compact.

Governments are formed for the purpose of securing and protecting men in the enjoyment of their natural rights, and they would fail of accomplishing that object if the power to regulate or prescribe the mode in which such rights are to be exercised be not lodged in the law-making department.

In short, there could be no government without such power, for without it all men would be in a state of nature, that is to say, without any restraint upon their conduct, except their own wills and the forcible opposition of their fellows. Hence, when men who come together for the purpose of adopting a form of government and establishing a system of laws, stipulate that the rights of life, liberty, property, and the pursuit of safety and happiness are inalienable, or shall remain inviolate forever, they are not to be understood as meaning that those rights shall not be at all interfered with by the law-making power. On the contrary, their language is to be interpreted in view of the object which has called it forth, or as meaning that those rights are not to be interfered with, except so far as the ends and objects of government may require. This section is not to be read by itself, but as a part only of the Constitution; and thus read, the obvious import of the whole is, that in order that these rights may be made secure, and that we may be protected in their enjoyment, we agree that the Government about to be established may pass all needful or reasonable rules and regulations for their security and enjoyment, without any power, however, to destroy or unnecessarily restrict or impair their reasonable exercise. Hence, this provision of the Constitution is not to be understood as putting life or liberty entirely beyond the reach of the Government, if, from misconduct, the general welfare of the community demands its sacrifice or restraint; or as allowing every one to acquire, possess and enjoy property after his own unregulated manner, and according to his uncontrolled will, but in such a manner, and by such means, as the general welfare of the community may require him to observe; or as allowing every one to seek safety and happiness in his own way, or according to his own notion, but by such ways and methods as the general good may demand. In short, while the exercise of these rights cannot be denied to any one, it may be regulated. The Constitution recognizes them as inalienable, and provides that they shall remain inviolate, but, at the same time declares that they must be exercised according to the maxim, *sic utere*

*tuo, ut alienum non laedas,* which lies at the foundation of the social compact. While every man is free and independent, and may enjoy and defend life and liberty, still he must do so in a way which does not interfere with the same right in other persons; while he may acquire, possess and protect property, he must do so in a way and by means which will not prevent others from doing the like; while he may pursue and obtain safety and happiness, he cannot be allowed to do so in a manner which may endanger or unreasonably impair the safety and happiness of others; or, generally, while every one is to be secure in the exercise and enjoyment of all these rights, he may be restrained or prohibited from exercising them in any manner which will interfere with a reasonable exercise of the same rights by other persons. Hence it is, that the Legislature is not only allowed, but required, among other things, to pass laws for the protection of life, liberty, property, and the pursuit of safety and happiness. Hence come all our laws against what are called crimes: crimes against the Government and people—as treason; against the persons of individuals—as murder and manslaughter; against property—as larceny, robbery and arson; against public justice—as perjury and bribery; against the public peace and tranquility—as routs and riots; against public morality, health and police—as bigamy, incest, prostitution and public nuisances. There cannot be legislation upon these topics, or any of them, without interfering, in a certain sense, and to a certain extent, with the natural rights of persons; but so long as such legislation is reasonable and necessary to accomplish any of the ends of the social compact, it cannot be considered as repugnant to the Constitution. Instead of being repugnant, such legislation is indispensable to the preservation and inviolability of the very rights in question. Every act which may tend to impair their exercise beyond what is needful for the general good may be prohibited. Of these, there are some which, by the common consent of mankind, are bad and mischievous in themselves—the *mala in se* of the common law—and others which may become so under certain relations and conditions, and which, therefore, the Legislature may prohibit,

as necessity or occasion may require—the *mala prohibita* of statute law. It is not to be supposed that the entire field of public offense has yet been covered by apt legislation. Vice is ingenious, and disguises itself in a variety of forms, for the purpose of evading existing laws. Things once regarded as harmless become vicious when contemplated from the level of a higher civilization, and legislation, if not in advance, must keep even pace with public sentiment, and to that end the requisite power is not denied to the Legislature.

It not being then, the purpose of the Constitution to inhibit all legislation affecting the natural rights of persons, but only such as may tend to their destruction or unreasonable restraint, the next question is, as to who is to be the judge of the necessity or reasonableness of prohibitory laws. Primarily, it lies with the people, when they adopt their Constitution, or establish their form of government. They may then establish such rules as they think proper; but, this being done, the residue of the power must be lodged in the law-making department of the Government. The power to determine what is necessary and appropriate legislation to accomplish the ends of government must necessarily be lodged in some body or department, and, by the same necessity, that body must be the Legislature, or the law-making power, subject to such restraints as may be imposed, as in the veto of the Executive, and the power of the Judiciary to annul, by its judgment, such laws as it may deem repugnant to the Constitution. If the Legislature abuse this power— the power to make laws, and to judge of their necessity and reasonableness—the remedy lies, under our form of government, with the people, through the ballot-box ; and, if that proves ineffectual, a further remedy lies in revolution, or the right which the people have to change their form of government whenever it becomes oppressive, or fails to afford that security for the rights of men which it was intended to provide.

In view of these fundamental principles, Legislatures have enacted a variety of laws which, undoubtedly, in a general sense, affect the rights of life, liberty, property, safety

and happiness, by way of restraint. Of such are laws regulating the slaughter of animals, the interment of the dead, the erection of buildings in cities and towns of inflammable materials, the manufacture and keeping of gunpowder and other explosive compounds, the vending of poisons and other noxious drugs, the sale of intoxicating beverages to certain classes of persons, as Indians, and even to all classes of persons—as in the case of the Prohibitory Liquor Laws of Maine and Massachusetts. Not of the least importance among such laws are those which are designed to promote the public health, by creating Boards of Health, with extraordinary powers over persons and property; by establishing quarantine and taking other summary measures to prevent the spread of contagious diseases; also, laws designed to promote public peace and good order, and public decency and morality, particularly in cities and incorporated towns—such as laws against nuisances, noisy and barbarous amusements, indecent exposures of the person, and the keeping and frequenting houses of ill-fame. Among the most notable of these prohibitory laws, and the one which goes, perhaps, to the extreme of legislative power in the direction under consideration, is that which prohibits the transaction of secular business on the Lord's day. The constitutionality of some of this legislation has been debated and doubted; but I believe the general opinion now is, that none of it is opposed, but, on the contrary, that all of it is not only consistent with, but essential to the most perfect enjoyment, in a constitutional sense, of the natural rights of persons.

The foregoing principles being elementary, I deem it unnecessary to dwell longer upon their consideration, or to cite cases in their support. I have not referred to them because they are doubtful or debatable, but because the necessity has been forced upon me by the line of argument which has been adopted by counsel.

So far, then, as these cases turn upon the first point made by counsel, it only remains for me to examine this ordinance, so far as it affects the petitioners, by the light of the foregoing principles, and declare whether it is repugnant to them, or, on the contrary, is a constitutional contribution to

their support; and on that head, in view of what has already been said, but little remains to be added.

By the title given to the ordinance, the Board of Trustees have declared that their object, in passing it, was to prevent immorality. To accomplish that object was, as we have seen, not only strictly within their power as a local Legislature for the City of Sacramento, but it was also within their duty.

The only other question is one of fact, whether the presence of females, at the places and at the time named in the ordinance, is of a vicious and immoral tendency. That question of fact, as already suggested, it was the duty of the Board of Trustees to examine and determine. I must presume that they performed this duty, or rather, I must accept the passage of the ordinance as their verdict, that the presence of females, in the places and at the time mentioned in the ordinance, is of a vicious tendency, and hurtful to that sound public morality which, by common consent, is indispensable to the general well-being of society. While it is undoubtedly within the power of the Judiciary to annul or overrule the judgments of legislative bodies, if they are repugnant to the Constitution, yet the Judiciary is not allowed to do so except in very plain cases. Upon a mere question of fact, like the present, the judgment of the law-maker is quite as likely to be accurate and just as that of the law-expounder, and I, at least, do not consider myself privileged to review the finding of a body of men, who are, at least, as well qualified as myself—and, doubtless, much better—to pronounce judgment upon a question of this character. But, were it otherwise, and were I vested with the power to determine the whole question as to the necessity and reasonableness of this ordinance, as a means for the promotion of public morality, I should not hesitate to add my voice to that of the Board of Trustees and affirm their judgment as sound, and their action as not only just and reasonable, but as eminently wise and salutary. In my judgment, the ordinance is not repugnant to the first section of the first article of the Constitution of this State.

*Second*—In support of the second and third points made on behalf of the petitioners, it is argued that the ordinance is a general law, and that, in order to be consistent with the eleventh section of the first article of the Constitution of this State, and the first section of the Fourteenth Amendment to the Constitution of the United States, it must operate upon all persons or citizens alike, which, as counsel argue, it does not do, because its operation is confined to one class of citizens or persons, namely, *females*.

The best commentary upon the construction and meaning of the eleventh section of the first article of the Constitution of this State, which declares that "every law of a general nature shall have a uniform operation," with which I have ever met, is found in the context of the instrument from which it was borrowed, namely, the sixth section of the first article of the Constitution of Iowa, which reads as follows: "All laws of a general nature shall have a uniform operation; the General Assembly shall not grant to any citizen or class of citizens privileges or immunities, which, *upon the same terms*, shall not equally belong to all citizens." Here the precise language of our Constitution is used, but it is accompanied by other language, as part of the same sentence and expressive of the same idea, which serves to disperse the cloud which, by reason of the "glittering generality" of the language employed, hangs about the meaning of our Constitution. The meaning of the Constitution of Iowa, and, therefore, the meaning of ours, is obvious from the latter clause of the former Constitution. Its meaning, as has been repeatedly declared by the highest judicial tribunal in the State, is not that general laws must act alike upon all subjects of legislation, or upon all citizens and persons, but that they shall operate uniformly, or in the same manner upon all persons who stand in the same category; that is to say, upon all persons who stand in the same relation to the law, in respect to the privileges and immunities conferred by it, or the acts which it prohibits. (*Smith* v. *Judge Twelfth Judicial District*, 17 Cal. 554; *French* v. *Teschemacher*, 24 Id. 544; *Bourland* v. *Hildreth*, 26 Id. 256; *Brooks* v. *Hyde*, 37 Cal. 366.) It was not intended by this provision to

prevent legislation which is local in its operation or special in its effect. It was not intended to overturn the laws of nature, or disturb the relations of cause and effect, or obliterate distinctions, where, from the very nature and necessity of things, distinctions must exist. It was not intended that all differences founded upon class or sex should be ignored. This must be so from the very nature of things, and from the universal custom and practice of law-makers. A few references to existing laws, whose constitutionality has never been questioned, and without which society would be, in many respects, subject to the mercy of evil-doers, is deemed sufficient to illustrate the fallacy, not to say the absurdity, of the construction for which counsel argue.

The common law and the laws of this State in relation to the competency of witnesses, have always, and still do, distinguish between persons, by providing that some shall be allowed to testify and others not. Under the common law and the laws of this State, some persons are allowed to make contracts, while the capacity to do so is denied to others—and the same person is allowed to make certain contracts, and denied the capacity to make certain other contracts; and, especially, from the commencement of English jurisprudence down to the present time, have greater disabilities in respect to the acquisition and enjoyment of property, and the power to make contracts and transact business been imposed upon females than upon males. And so, on the other hand, have greater burdens always been cast upon males than upon females, as, for example, military and jury duties. If we enter the field of criminal law, the distinction is still maintained. Certain persons are declared to be incapable of crime, while the contrary is true of the great majority. Criminal laws are found, and they have always existed, which act upon males and not upon females, and others upon females and not males, as laws against rape, the crime against nature, and laws against prostitution and abortion. To give to this provision of our State Constitution, or to the Fourteenth Amendment of the Federal Constitution, in view of such legislation, the construction for which counsel contend, would be to erase three fourths of the statutes of

this State, to overturn the foundations of the common law itself and to discard as useless, the main pillars of the social compact. The whole matter may be summed up in the single proposition that all prohibitory laws are supposed to be founded upon reason, and are designed to promote and protect right action, and prevent wrong doing. In ascertaining what is right and providing for its protection, and what is wrong and providing for its prevention, lies the whole duty of the Legislature. Wherever wrong is found, they are allowed and required to provide an adequate remedy, and they may confine the operation of the remedy where the wrong exists, and its application to the persons by whom the wrong or evil is wrought; and in that, as in every other instance, they are to look to the nature of the case, and the adequacy of the remedy. If the wrong is of that character which permits of its being done only by certain classes of persons, or by one sex and not by the other, neither reason nor the Constitution of this State nor of the United States, requires that the remedy should be broader than the evil, or be made to act upon persons other than those whose conduct produces the mischief; or stands in the way of the Legislature's directing the remedy, by special designation, against the class or sex to which, if so be, the wrong or evil is exclusively due. A contrary doctrine would lead us to the absurd consequence of declaring that offenses which, in view of their nature, cannot be common to both sexes, cannot, for that reason, be prohibited by law.

My conclusion is, that this ordinance is not repugnant to the eleventh section of the first article of the Constitution of this State, nor to the first section of the Fourteenth Amendment of the Constitution of the United States; and I am authorized to add that I have submitted my conclusions to the judgment of two of my associates—Chief Justice SAWYER and Justice SPRAGUE—and that they have met with their approval.

The petitioners are, therefore, remanded to the custody from whence they came.