## Charles Kitson v. The Mayor, Etc., of Ann Arbor.

*Constitutional law: Saloon keepers: License: Intoxicating liquors.* An ordinance of Ann Arbor, requiring saloon keepers to take out a license, and pay a substantial license tax, is not in violation of the clause in the constitution forbidding licenses for the sale of intoxicating liquors.

*Saloon: License: Intoxicating liquors.* A saloon is a place of refreshment, and not necessarily a place for selling intoxicating liquors; and such a license would in no way legalize the sale of any article forbidden by law.

*Ordinance: License: Saloon: Restraint of trade.* Such an ordinance is not void as an illegal restraint of trade. It has always been customary to regulate, by license or otherwise, such places of resort, or such classes of business, however innocent in themselves, as might easily be used for dangerous or improper purposes, and which therefore require more oversight and restraint than ordinary callings liable to no such abuses. Such are taverns, places of amusement, eating houses, and many others.

*Charter of Ann Arbor: Saloon keeping: Licenses: Taxation.* The charter of Ann Arbor requires saloon keeping to be prevented except as licensed. The charter contains nothing to interfere with the right to raise revenue by means of licenses, and the provisions of the ordinance requiring a heavy license fee, are legitimate means of taxation, and valid unless unreasonable, which is not found to be the case here.

*Constitutional law: Licenses: Taxation: Assessments.* Such regulations are not in violation of the clause of the constitution which limits taxation to assessments on property at its value. They are in the nature of specific taxes on business, which were upheld in *Walcott v. People*, 17 *Mich.*, 68.

*Licenses: Security against disorder: Public policy.* It is also lawful, and has been customary in the territory and state of Michigan, to require security against disorder to be given by persons obtaining licenses for business requiring restraint and regulation on grounds of public policy.

*Heard October 17 and 18. Decided January 8.*

Error to Washtenaw Circuit.

*Lawrence & Frazer* and *H. J. Beakes,* for plaintiff in error.

*Felch & Grant,* for defendants in error.

CAMPBELL, J.

The validity of the ordinance under which Kitson was convicted, is assailed on three principal grounds: *First,* That it violates the clause of the constitution forbidding licenses for the sale of intoxicating liquors; *second,* that it is an unreasonable restraint of trade; and *third,* that it is an unlawful attempt to raise revenue.

The first ground rests entirely on the assumption that a saloon is necessarily a place for the sale of intoxicating liquors, and Kitson sold nothing else; and that a license to keep a saloon, amounts to a license to sell such liquors.

This ground is not tenable, unless that definition of the word " saloon," is the only one admissible.    The legislation of the state must be construed together; and as the sale of intoxicating liquors is, in general, absolutely forbidden by our statutes, it must be assumed that the legislature, in allowing saloons to be licensed, had in their minds some kind of saloons which could be recognized as doing business otherwise than in dealing in such liquors.

The word " saloon," applied to places of resort, is defined by Worcester to be " *a place of refreshment.*"    This is certainly the popular understanding of the term, and it is applied in all orderly communities to all places where persons resort to obtain food or drink, which are not also devoted to some other business.    Undoubtedly, a narrower meaning is sometimes applied, as it is to "grocery," and as it was once to "tavern."    But saloons, and groceries, and taverns, are mainly designed for innocent purposes, and if a prohibitory law were passed forbidding any of the three to be kept open, it would become necessary to contrive some

new phrases, to indicate places essential to the convenience of all communities.

The license of a saloon can only extend to authorize such business to be done as can lawfully be done in a saloon, and to include all that is lawful. If a person sees fit, without license, to sell none but refreshments not authorized by law, he does not thereby cease to keep a saloon. He merely violates two laws instead of one. A pawnbroker might as well attempt to do business without a license, by confining his dealings to stolen goods, or an auctioneer, by making no legitimate sales, and holding none but Peter Funk auctions.

It is claimed, however, that if the license only permits the sale of harmless refreshments, it is an unreasonable restraint of trade to discriminate against a lawful business, and unreasonable also to allow the restrictions to go so far as they do here.

It has always been considered improper to pass by-laws in restraint of trade, as tending to discourage enterprise and to create monopolies. But it has been seen for centuries that certain classes of business—not held unlawful in themselves—gave facilities for unlawful conduct, and allowed action dangerous to the public. Such callings have always been held to require some regulation, to prevent their abuse. All places of general resort for amusement or refreshment are liable to harbor dangerous persons, and to furnish opportunities for combinations, and for breaches of the peace, and if crowded, for thefts and outrages. If any kind of refreshment is forbidden by law, it is not very difficult for those who may sell a variety of drinks, to sell intoxicating liquors among the rest. The license system has always been found desirable to bring these callings—so readily capable of abuse—within more effectual control, in

order that crime may be prevented or detected, and disorder checked.

The charter of Ann Arbor distinctly contemplates that public policy requires the business of keeping places of resort for eating and drinking, to be restrained. It is to be "*prevented*," except as it may be licensed. The policy of all license laws which discriminate between different callings, is to limit the number of places where such business is to be done, in order to lessen the mischief, and to make it easier to keep up any necessary supervision, and also to secure, as far as may be, the character and responsibility of those who may carry on such callings. Thus far there have been but two ways devised for these ends. The first is to limit the number of licenses granted, and select the persons licensed on some proof of their character, or upon the certificate or application of magistrates or neighbors, vouching for them. The second is that adopted in Ann Arbor, requiring a considerable license fee, and security for good behavior. Both of these methods have been legalized in different times and places, separately or together.

Under the territorial laws, and for many years after the organization of the state, licenses were confined to such number of taverns as should be deemed necessary for the accommodation of travelers, and they could only be granted on satisfactory evidence that the person applying was of good moral character, and of sufficient abilities to keep a tavern, and that he had accommodations to entertain travelers, and that a tavern was necessary for their actual accommodation; and these facts the licensing tribunal was by the territorial laws compelled to put in writing, subscribed by the members.—*L. 1821, p. 69; L. 1827, p. 465; R. S. 1838, pp. 206, 207, §§ 18, 19, 24; R. S. 1846, pp. 186,*

*187*, §§ *18*, *26*.  The state statutes referred to allowed licenses to other than tavern keepers, but only in any case where the board was satisfied that the "public good" would "be promoted thereby, and that the person applying was of good moral character." The earlier laws required security for good behavior, in addition to the license fees, and so long as licenses were granted in Detroit, similar recognizances were required.

These licenses were intended to restrain especially the sale of liquors, but they were not confined to that; and in regard to taverns and victualling houses, as well as other places of resort, there were very strict regulations as to accommodations for customers, and the prevention of gaming and disorder.

The objection to select licenses was found to be that there was danger of partiality and unfairness, and possibly of corruption, where the number was much restricted.

But if no regard is paid to persons, and all are enabled to stand on the same footing, the only possible way to keep the business within control, is to impose such conditions as require character and responsibility. A substantial license fee, and responsible sureties, are the only resort, where all persons are on the same footing of eligibility. It is less invidious to require these, than to distinguish between applicants, and confine the number of licenses. One chief advantage of a license system is, that every licensed person is interested in suppressing unlicensed business. But if the door is opened altogether, and the license attainable by responsible and irresponsible alike, the license system ceases to be of any value; and the traffic or business is practically unlimited, when no one is pecuniarily interested in seeing to its enforcement.

The question before us is substantially brought down to an inquiry, whether it is open to the corporation of Ann

26 MICH.—42.

Arbor to resort to this system of charging heavy license fees.

It is evident from the ordinance that the revenue to be derived from licenses is expected to be more than nominal, and it appears from the facts that it supports a considerable police force.    And while the necessity of such a force is much increased by the existence of the various places of resort and callings requiring watching and regulation, yet it would be idle to claim that these create the entire necessity for a local police.    The support of some force of that kind is one of the inevitable burdens of every city, and belongs to its common funds.    I think that the power to charge such license fees as are fixed under the ordinance in question, must be rested, if it exists, upon some other foundation than the claim that it exacts no more than may be reasonably required for the expense of its enforcement.

If this question had not been settled by previous decisions of this court, I should have been compelled to the conclusion that no such power existed.    But the principles already settled in regard to the lawful means of raising revenue, seem to me decisive.

The charter of Ann Arbor expressly empowers the corporation to provide means for paying its liabilities and defraying the contingent expenses of the city, "subject only to the limitations and restrictions in this act contained."— *Charter, Title 5,* § *1.*

There is no limitation preventing the demand of such license fees as may be deemed reasonable.    There is nothing in the charter confining the levying of such charges to the expense of the papers, or to the sum required to enforce the licensing ordinances.    Unless the revenue is to be raised entirely by *ad valorem* taxes on property, I can see no legal objection to such exactions by way of license charges as the city may see fit to demand, so long as they are not so

grossly unreasonable and oppressive as to render the ordinances void on that ground.

· The only cases involving the validity of licenses, which have called for a decision on any point resembling that raised here, are *Chilvers v. The People, 11 Mich. R., 43*, and *Ash v. The People, 11 Mich. R., 347.* The former case is not really analogous, because a ferry license involves the transfer of a valuable franchise, which is itself a right of property, and may be sold for such price as is agreed upon, where there is nothing in the charter to prevent it. But in *Ash v. The People*, the license was for a business involving no franchise. The argument in that case was chiefly confined to the question, whether the sum there charged could be treated as a tax, it having been assumed,—rightly or wrongly,—that if a tax, it would have been illegal. The majority of the court held it not a tax, but a reasonable charge for the expense of supervising the business. I was unable to concur in that view, regarding it as a tax, and as such unlawful.

But the lawfulness of any other taxation than upon a valuation, was afterwards considered in the case of *Walcott v. The People, 17 Mich. R., 68.* A majority of the members of the court sitting in that case held that the provision of the constitution requiring taxes to be assessed upon property at its cash value, did not operate to prevent the levying of specific taxes upon peculiar classes of business, as business, and not as property; in which case the rule requiring a uniform rule of taxation was held not applicable. I think that decision removes any legal difficulty in the way of license fees to any amount that may be reasonable, and that they are not made any the less lawful because imposed for the purpose of revenue, if the charter allowing them does not forbid their use for that purpose.

The power is one that is useful; and while, if these

questions had not been already passed upon, I should find difficulty in affirming it, I conceive that it is no longer an open question. I think the conviction should be affirmed, with costs.

CHRISTIANCY, CH. J., and GRAVES, J., concurred.

COOLEY, J., did not sit in this case.