## BARTEMEYER *v.* IOWA. ·

1. The usual and ordinary legislation of the States regulating or prohibiting
   the sale of intoxicating liquors raises no question under the Constitution
   of the United States prior to the fourteenth amendment of that instru-
   ment.
2. The right to sell intoxicating liquors is not one of the privileges and im-
   munities of citizens of the United States which by that amendment the
   States were forbidden to abridge.
3. But if a case were presented in which a person owning liquor or other
   property at the time a law was passed by the State absolutely prohibit-
   ing any sale of it, it would be a very grave question whether such a law
   would not be inconsistent with the provision of that amendment which
   forbids the State to deprive any person of life, liberty, or property
   without due course of law.
4. While the case before the court attempted to present that question, it
   failed to do it, because the plea, which is taken as true, did not state, in
   due form and by positive allegation, the time when the defendant be-
   came the owner of the liquor sold; and, secondly, because the record·
   satisfied the court that this was a moot case, made up to obtain the
   opinion of this court on a grave constitutional question, without the
   existence of the facts necessary to raise that question.
5. In such a case, where the Supreme Court of the State to which the writ
   of error is directed has not considered the question, this court will not
   feel at liberty to go out of its usual course to decide it.

---

6. Per Justices BRADLEY and FIELD. This case distinguished from the *Slaughter-House Cases.*

ERROR to the Supreme Court of Iowa; the case being thus:

Bartemeyer, the plaintiff in error, was tried before a justice of the peace on the charge of selling intoxicating liquors, on the 8th of March, 1870, to one Timothy Hickey, in Davenport Township, in the State of Iowa, and was acquitted. On an appeal to the Circuit Court of the State the defendant filed the following plea:

"And now comes the defendant, F. Bartemeyer, and for plea to the information in this cause says: He admits that at the time and place mentioned-in said information he did sell and deliver to one Timothy Hickey one glass of intoxicating liquor called whisky, and did then and there receive pay in lawful money from said Hickey for the same. But defendant alleges that he committed no crime known to the law by the selling of the intoxicating liquor hereinbefore described to said Hickey, for the reason that he, the defendant, was the lawful owner, holder, and possessor, in the State of Iowa, of said property, to wit, said one glass of intoxicating liquor, sold as aforesaid to said Hickey, prior to the day on which the law was passed under which these proceedings are instituted and prosecuted, known as the act for the suppression of intemperance, and being chapter sixty-four of the revision of 1860; and that, prior to the passage of said act for the suppression of intemperance, he was a citizen of the United States and of the State of Iowa."

Without any evidence whatever the case was submitted to the court on this written plea, the parties waiving a jury, and a judgment was rendered that the defendant was guilty as charged, and he was sentenced to pay a fine of $20 and costs. A bill of exceptions was taken, and the case carried to the Supreme Court of Iowa, and that court affirmed the judgment of the Circuit Court and rendered a judgment for costs against the defendant, who now brought the case here on error.

There was sufficient evidence that the main ground relied on to reverse the judgment in the Supreme Court of Iowa

was, that the act of the Iowa legislature on which the prosecution was based, was in violation of the Constitution of the United States.

The opinion of that court was in the record, and, so far as the general idea was involved, that acts for suppressing the use of intoxicating drinks are opposed to that instrument, the court contented themselves with a reference to the previous decisions of that court, namely: *Our House, No. 2, v. The State,*\* *Zumhof* v. *The State,*† *Santo* v. *The State;*‡ cases in which the negative of the idea is maintained. But, referring to the allegation in the plea that the defendant was the owner of the liquor sold before the passage of the act under which he was prosecuted, they said that the transcript failed to show that the admissions and averments of the plea were all the evidence in the case, and that other testimony may have shown that he did not so own and possess the liquor. [This, however, rather seemed, as the Reporter understood it, to be a mistake; at least the record,§ if he read it correctly, stated, as he has already said, that the plea was all the evidence given and received on the trial.]

The case was submitted on printed arguments some time ago, and when the *Slaughter-House Cases*, reported in 16th Wallace, 36, were argued; the position of the plaintiff in error in this case being, as it partly was in those, that the act of the State legislature, the maintenance of which by the courts below was the ground of the writ of error, was in violation of the fourteenth amendment to the Constitution, which runs thus:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are *citizens of the United States*, and of the State where they reside.

"*No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person* of life, liberty, or *property without due process of law*, nor deny to any person within its jurisdiction the equal protection of the laws."

---

\* 4 G. Greene, 171.          † Ib. 526.          ‡ 2 Iowa, 165.
§ See bottom of page 6 of the same.

The judgment was announced at the present term.

*Mr. W. T. Dittoe, for the plaintiff in error ; Mr. H. O'Connor, Attorney-General of Iowa, for the State, contra.*

Mr. Justice MILLER, after stating the case, delivered the opinion of the court, as follows:

The case has been submitted to us on printed argument. That on the part of the plaintiff in error has taken a very wide range, and is largely composed of the arguments familiar to all, against the right of the States to regulate traffic in intoxicating liquors. So far as this argument deals with the mere question of regulating this traffic, or even its total prohibition, as it may have been affected by anything in the Federal Constitution prior to the recent amendments of that instrument, we do not propose to enter into a discussion. Up to that time it had been considered as falling within the police regulations of the States, left to their judgment, and subject to no other limitations than such as were imposed by the State constitution, or by the general principles supposed to limit all legislative power. It has never been seriously contended that such laws raised any question growing out of the Constitution of the United States.

But the case before us is supposed by counsel of the plaintiff in error to present a violation of the fourteenth amendment of the Constitution, on the ground that the act of the Iowa legislature is a violation of the privileges and immunities of citizens of the United States which that amendment declares shall not be abridged by the States; and that in his case it deprives him of his property without due process of law.

As regards both branches of this defence, it is to be observed that the statute of Iowa, which is complained of, was in existence long before the amendment of the Federal Constitution, which is thus invoked to render it invalid. Whatever were the privileges and immunities of Mr. Bartemeyer, as they stood before that amendment, under the Iowa statute, they have certainly not been abridged by any

action of the State legislature since that amendment became a part of the Constitution. And unless that amendment confers privileges and immunities which he did not previously possess, the argument fails. But the most liberal advocate of the rights conferred by that amendment have contended for nothing more than that the rights of the citizen previously existing, and dependent wholly on State laws for their recognition, are now placed under the protection of the Federal government, and are secured by the Federal Constitution. The weight of authority is overwhelming that no such immunity has heretofore existed as would prevent State legislatures from regulating and even *prohibiting* the traffic in intoxicating drinks, with a solitary exception. That exception is the case of a law operating so rigidly on property in existence at the time of its passage, absolutely prohibiting its sale, as to amount to depriving the owner of his property. A single case, that of *Wynehamer* v. *The People*,* has held that as to such property the statute would be void for that reason. But no case has held that such a law was void as violating the privileges or immunities of citizens of a State or of the United States. If, however, such a proposition is seriously urged, we think that the right to sell intoxicating liquors, so far as such a right exists, is not one of the rights growing out of citizenship of the United States, and in this regard the case falls within the principles laid down by this court in the *Slaughter-House Cases*.†

But if it were true, and it was fairly presented to us, that the defendant was the owner of the glass of intoxicating liquor which he sold to Hickey, at the time that the State of Iowa first imposed an absolute prohibition on the sale of such liquors, then we concede that two very grave questions would arise, namely: 1. Whether this would be a statute depriving him of his property without due process of law; and secondly, whether if it were so, it would be so far a violation of the fourteenth amendment in that regard as would call for judicial action by this court?

---

* 3 Kernan, 486.                    † 16 Wallace, 36.

Both of these questions, whenever they may be presented to us, are of an importance to require the most careful and serious consideration. They are not to be lightly treated, nor are we authorized to make any advances to meet them until we are required to do so by the duties of our position.

In the case before us, the Supreme Court of Iowa, whose judgment we are called on to review, did not consider it. They said that the record did not present it.

It is true the bill of exceptions, as it seems to us, does show that the defendant's plea was all the evidence given, but this does not remove the difficulty in our minds. The plea states that the defendant was the owner of the glass of liquor sold prior to the passage of the law under which the proceedings against him were instituted, being chapter sixty-four of the revision of 1860.

If this is to be treated as an allegation that the defendant was the owner of that glass of liquor prior to 1860, it is insufficient, because the revision of the laws of Iowa of 1860 was not an enactment of new laws, but a revision of those previously enacted; and there has been in existence in the State of Iowa, ever since the code of 1851, a law strictly prohibiting the sale of such liquors; the act in all essential particulars under which the defendant was prosecuted, amended in some immaterial points. If it is supposed that the averment is helped by the statement that he owned the liquor before the law was passed, the answer is that this is a mere conclusion of law. He should have stated when he became the owner of the liquor, or at least have fixed a date when he did own it, and leave the court to decide when the law took effect, and apply it to his case. But the plea itself is merely argumentative, and does not state the ownership as a fact, but says he is not guilty of any offence, because of such fact.

If it be said that this manner of looking at the case is narrow and technical, we answer that the record affords to us on its face the strongest reason to believe that it has been prepared from the beginning, for the purpose of obtaining the opinion of this court on important constitutional ques-

tions without the actual existence of the facts on which such questions can alone arise.

It is absurd to suppose that the plaintiff, an ordinary retailer of drinks, could have proved, if required, that he had owned that particular glass of whisky prior to the prohibitory liquor law of 1851.

The defendant, from his first appearance before the justice of the peace to his final argument in the Supreme Court, asserted in the record in various forms that the statute under which he was prosecuted was a violation of the Constitution of the United States. The act of the prosecuting attorney, under these circumstances, in going to trial without any replication or denial of the plea, which was intended manifestly to raise that question, but which carried on its face the strongest probability of its falsehood, satisfies us that a moot case was deliberately made up to raise the particular point when the *real* facts of the case would not have done so. As the Supreme Court of Iowa did not consider this question as raised by the record, and passed no opinion on it, we do not feel at liberty, under all the circumstances, to pass on it on this record.

The other errors assigned being found not to exist, the judgment of the Supreme Court of Iowa is affirmed.

Mr. Justice BRADLEY, concurring:

Whilst I concur in the conclusion to which the court has arrived in this case, I think it proper to state briefly and explicitly the grounds on which I distinguish it from the *Slaughter-House Cases,* which were argued at the same time. I prefer to do this in order that there may be no misapprehension of the views which I entertain in regard to the application of the fourteenth amendment to the Constitution.

This was a prosecution for selling intoxicating liquor, in Iowa, contrary to a law of that State which prohibits the sale of such liquor. The defendant pleaded that he was the lawful owner of the liquor in Iowa and a citizen of the United States prior to the day on which the law was passed, being chapter sixty-four of the revision of 1860. Judgment

was given against the defendant on his plea. The truth is, that the law in question was originally passed in 1851 and was incorporated into the revision of 1860, in the chapter referred to in the plea. Whether the plea meant to assert that the defendant owned the liquor prior to the passage of the original law, or only prior to its re-enactment in the revision, is doubtful, and, being doubtful, it must be interpreted most strongly against the pleader. It amounts, therefore, only to an allegation that the defendant became owner of the liquor at a time when it was unlawful to sell it in Iowa. The law, therefore, was not in this case an invasion of property existing at the date of its passage, and the question of depriving a person of property without due process of law does not arise. No one has ever doubted that a legislature may prohibit the vending of articles deemed injurious to the safety of society, provided it does not interfere with vested rights of property. When such rights stand in the way of the public good they can be removed by awarding compensation to the owner. When they are not in question, the claim of a right to sell a prohibited article can never be deemed one of the privileges and immunities of the citizen. It is *toto cœlo* different from the right not to be deprived of property without due process of law, or the right to pursue such lawful avocation as a man chooses to adopt, unrestricted by tyrannical and corrupt monopolies. By that portion of the fourteenth amendment by which no State may make or enforce any law which shall abridge the privileges and immunities of citizens of the United States, or take life, liberty, or property, without due process of law, it has now become the fundamental law of this country that life, liberty, and property (which include " the pursuit of happiness ") are sacred rights, which the Constitution of the United States guarantees to its humblest citizen against oppressive legislation, whether national or local, so that he cannot be deprived of them without due process of law. The monopoly created by the legislature of Louisiana, which was under consideration in the *Slaughter-House Cases*, was, in my judgment, legislation of this sort

and obnoxious to this objection. But police regulations, intended for the preservation of the public health and the public order, are of an entirely different character. So much of the Louisiana law as partook of this character was never objected to. It was the unconscionable monopoly, of which the police regulation was a mere pretext, that was deemed by the dissenting members of the court an invasion of the right of the citizen to pursue his lawful calling. A claim of right to pursue an unlawful calling stands on very different grounds, occupying the same platform as does a claim of right to disregard license laws and to usurp public franchises. It is greatly to be regretted, as it seems to me, that this distinction was lost sight of (as I think it was) in the decision of the court referred to.

I am authorized to say that Justices SWAYNE and FIELD concur in this opinion.


Mr. Justice FIELD, concurring:

I concur in the views expressed by Mr. Justice BRADLEY, but will add a few observations.

I accept the statement made in the opinion of the court, that the act of Iowa of 1860, to which the plea of the defendant refers, was only a revision of the act of 1851, and agree that, for this reason the averment of the ownership of the liquor sold prior to the passage of the act of 1860 did not answer the charge for which the defendant was prosecuted. I have no doubt of the power of the State to regulate the sale of intoxicating liquors when such regulation does not amount to the destruction of the right of property in them. The right of property in an article involves the power to sell and dispose of such article as well as to use and enjoy it. Any act which declares that the owner shall neither sell it nor dispose of it, nor use and enjoy it, confiscates it, depriving him of his property without due process of law. Against such arbitrary legislation by any State the fourteenth amendment affords protection. But the prohibition of sale in any way, or for any use, is quite a different

thing from a regulation of the sale or use so as to protect the health and morals of the community. All property, even the most harmless in its nature, is equally subject to the power of the State in this respect with the most noxious.

No one has ever pretended, that I am aware of, that the fourteenth amendment interferes in any respect with the police power of the State. Certainly no one who desires to give to that amendment its legitimate operation has ever asserted for it any such effect. It was not adopted for any such purpose. The judges who dissented from the opinion of the majority of the court in the *Slaughter-House Cases* never contended for any such position. But, on the contrary, they recognized the power of the State in its fullest extent, observing that it embraced all regulations affecting the health, good order, morals, peace, and safety of society, that all sorts of restrictions and burdens were imposed under it, and that when these were not in conflict with any constitutional prohibition or fundamental principles, they could not be successfully assailed in a judicial tribunal. But they said that under the pretence of prescribing a police regulation the State could not be permitted to encroach upon any of the just rights of the citizen, which the Constitution intended to guard against abridgment; and because, in their opinion, the act of Louisiana, then under consideration, went far beyond the province of a police regulation, and created an oppressive and odious monopoly, thus directly impairing the common rights of the citizens of the State, they dissented from the judgment of the court.

They could not then, and do not now, see anything in the act which fell under the denomination of a police or sanitary regulation, except the provisions requiring the landing and slaughtering of animals below the city of New Orleans and the inspection of the animals before they were slaughtered; and of these provisions no complaint was made. All else was a mere grant of special and exclusive privileges. And it was incomprehensible to them then, and it is incomprehensible to them now, how, in a district of country nearly as large as the State of Rhode Island, and embracing a pop-

ulation of over two hundred thousand souls, any conditions of health or morals should require that the preparation of animal·food, a prime necessity of life, should be intrusted to a single corporation for twenty-five years; or how in all that vast district, embracing eleven hundred and fifty-four square miles, there could be only one locality and one building in which animals could with safety to the public health be sheltered and slaughtered. And with all the light shed upon the subject by the elaborate opinion of the majority, they do not yet understand that it belongs to the police power of any State to require the owner of animals to give to the butcher a portion of each animal slaughtered. If the State can say the owner shall give the horns and the hoofs, it may say he shall give the hide and the tallow, or any part of the animal. It may say that the butcher shall retain the four quarters and return to the owner only the head and the feet. The owner may require the very portions he is compelled to surrender for his own business—the horns, for example, for the manufacture of combs, and the hoofs for the manufacture of glue, and other portions for equally useful purposes.

It was because the act of Louisiana transcended the limits of police regulation, and asserted a power in the State to farm out the ordinary avocations of life, that dissent was made to the judgment of the court sustaining the validity of the act.

It was believed that the fourteenth amendment had taken away the power of the State to parcel out to favored citizens the ordinary trades and callings of life, to give to A. the sole right to bake bread; to B. the sole right to make hats; to C. the sole right to sow grain or plough the fields; and thus at discretion, to grant to some the means of livelihood, and withhold it from others. It was supposed that there were no privileges or immunities of citizens more sacred than those which are involved in the right to " the pursuit of happiness," which is usually classed with life and liberty; and that in the pursuit of happiness, since that amendment became part of the fundamental law, every one was free to

follow any lawful employment without other restraint than such as equally affects all other persons.

Before this amendment and the thirteenth amendment were adopted, the States had supreme authority over all these matters, and the National government, except in a few particulars, could afford no protection to the individual against arbitrary and oppressive legislation. After the civil war had closed, the same authority was asserted, and, in the States recently in insurrection, was exercised to the oppression of the freedmen; and towards citizens of the North seeking residence there, or citizens resident there who had maintained their loyalty during the war for nationality, a feeling of jealousy and dislike existed which could not fail soon to find expression in discriminating and hostile legislation. It was to prevent the possibility of such legislation in future, and its enforcement where already adopted, that the fourteenth amendment was directed. It grew out of the feeling that a union which had been maintained by such costly sacrifices was, after all, worthless if a citizen could not be protected in all his fundamental rights everywhere—North and South, East and West—throughout the limits of the Republic. The amendment was not, as held in the opinion of the majority, primarily intended to confer citizenship on the negro race. It had a much broader purpose; it was intended to justify legislation, extending the protection of the National government over the common rights of *all* citizens of the United States, and thus obviate objections to the legislation adopted for the protection of the emancipated race. It was intended to make it possible for *all* persons, which necessarily included those of every race and color, to live in peace and security wherever the jurisdiction of the nation reached. It, therefore, recognized, if it did not create, a National citizenship, and made all persons citizens except those who preferred to remain under the protection of a foreign government; and declared that their privileges and immunities, which embrace the fundamental rights belonging to citizens of all free governments, should not be abridged by any State. This National citi-

zenship is primary, and not secondary. It clothes its possessor, or would do so if not shorn of its efficiency by construction, with the right, when his privileges and immunities are invaded by partial and discriminating legislation, to appeal from his State to his Nation, and gives him the assurance that, for his protection, he can invoke the whole power of the government.

This case was considered by the court in connection with the *Slaughter-House Cases*, although its decision has been so long delayed. I have felt, therefore, called upon to point out the distinction between this case and those cases, and as there has been some apparent misapprehension of the views of the dissenting judges, to restate the grounds of their dissent.

I concur in the judgment in this case.

JUDGMENT AFFIRMED.