Baker vs. The State.

## BAKER vs. THE STATE.

*January 19 — March 14, 1882.*

STATUTE CONSTRUED: CONSTITUTIONAL LAW. *Criminal liability of banker taking deposits, etc., with knowledge of his insolvency.*

1. Under sec. 4541, R. S., any person who is himself engaged in the business of a banker or broker in this state, and who receives money, paper circulating as money, or commercial paper, on deposit or for safe keeping, etc., when he knows or has good reason to know that he is "unsafe or insolvent," is liable to be punished as provided in that section; and such liability is not confined to officers, clerks or agents of corporations or individuals engaged in such business.

2. Said statute is not in conflict with the 14th amendment of the federal constitution (which declares that "no state shall deny to any person within its jurisdiction the equal protection of the laws"), nor with any provision of our state constitution, but is valid.

ERROR to the Circuit Court for *Fond du Lac* County.

The plaintiff in error was arrested and taken into custody, July 2, 1881, by the sheriff of Fond du Lac county, upon a

warrant duly issued by a justice of the peace of that county, containing the following recitals: "That *Robert A. Baker* did, on the 4th day of May, 1881, at the city of Fond du Lac in said county, *feloniously* accept and receive on deposit, from the said Nicholas Serese, the sum of $125 in money, and of that value, and being the property of the said Nicholas Serese and P. Serese; and that the *said Robert A. Baker was then and there engaged in a banking and deposit business*, at said city and county of Fond du Lac, Wisconsin, in *Robert A. Baker's* bank; and that the money aforesaid was accepted and received in said *Robert A. Baker's* bank on deposit by the said *Robert A. Baker;* and that he, the said *Robert A. Baker*, at the time when he took said money on deposit in his said bank, knew, or had good reason to know, that said bank and he, the said *Robert A. Baker*, was unsafe and insolvent; that said bank and said *Robert A. Baker* was in fact then and there insolvent; against the peace," etc. While so held, the plaintiff in error sued out a writ of *habeas corpus*, upon a petition in due form, and caused the same to be served upon the sheriff, who made return thereto before the judge of the circuit court for Fond du Lac county, setting up the said warrant as the sole and only ground for the detention of the prisoner; and the plaintiff in error demurred to such return. The hearing of the issue thus joined was had before the said circuit court, and after full consideration the court entered an order denying the prayer of the plaintiff in error to be discharged, and remanded him to the custody of the sheriff of Fond du Lac county. Thereupon a writ of *certiorari* was issued out of this court, directed to the judge of said circuit court, to bring up the record and such adjudication for review.

*Edw. S. Bragg*, for the plaintiff in error.

*The Attorney General*, for the state.

CASSODAY, J. The arrest was made under section 4541, R. S., which reads as follows: "Any officer, director, stockholder,

cashier, teller, manager, clerk or agent of any bank, banking, exchange, brokerage or deposit company, corporation or institution, or of any person, company or corporation engaged in whole or in part in banking, brokerage, exchange or deposit business in any way, or any person engaged in such business in whole or in part, who shall accept or receive on deposit, or for safe-keeping, or to loan, from any person, any money or any bills, notes or other paper circulating as money, or any notes, drafts, bills of exchange, bank checks or other commercial paper for safe-keeping or for collection, *when he knows, or has good reason to know*, that such bank, company or corporation, or that such person, *is unsafe or insolvent*, shall be punished by imprisonment in the state prison not more than ten years nor less than one year, or by fine not exceeding $10,000." This section is a revision of section 1, ch. 213, Laws of 1876.

1. Did the transaction of the plaintiff in error, as charged in the warrant, bring him within the provisions of this section? The charge in the warrant is, that *Baker*, being engaged in a banking and deposit business, accepted and received on deposit, as such banker, the money named, knowing, or having good reason to know, that he and his bank were unsafe and insolvent. Was such action on his part prohibited by the section quoted? It seems to be conceded that it is applicable to the "cashier, teller, manager, clerk or agent" of a party so engaged; but the contention is that it does not apply to an individual who is himself engaged as principal or proprietor of such business. The difficulty in construing the section is the multiplicity of parties to which it is sought to be made applicable. The meaning of the section may be more apparent by omitting such words as are not applicable here, and all parties except the principal or proprietor of such business. By such elimination the section would read: "Any person engaged in such (banking, brokerage, exchange or deposit) business in whole or in part, who shall accept or receive on

Baker vs. The State.

deposit, or for safe-keeping, or to loan, from any person any money, . . . *when he knows, or has good reason to know,* that *such bank, company or corporation,* or that *such person,* is *unsafe* or *insolvent,* shall be punished by imprisonment," etc.

The words "unsafe or insolvent" would seem to be as applicable to the individual so engaged as to "such bank, company or corporation." Since this is so, and since the act sought to be punished is such acceptance or receiving by one knowing or having good reason to know that such bank, company or corporation, or "*such person,* is unsafe or insolvent," there would seem to be no ground for holding that the "cashier, teller, manager, clerk or agent of the person engaged in such business in whole or part," and so accepting or receiving with knowledge of his proprietor's insolvency, should be punished under the section, but that the proprietor himself, doing the same act, with as good, if not better, knowledge and means of knowledge, should be excluded from its operation. Any other construction renders nugatory the words "or any person engaged in such business in whole or in part," and the words, "or that such person;" and this the learned counsel for the plaintiff in error concedes to be one of the "logical deductions" of his argument. But we are constrained to believe that the prohibition is aimed at the person so engaged, as well as at the others named. We must therefore hold that the act charged brings the plaintiff in error within the provisions of this section.

2. It is urged that such legislation is prohibited by the clause: "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws," found in the fourteenth amendment to the constitution of the United States; and the following cases are cited in support of the contention: *Live Stock, etc., Ass'n v. Crescent City, etc., Co.,* 1 Abb. (U. S.), 398; *Slaughter-House Cases,* 16 Wall., 36; *Bartemeyer v. Iowa,* 18 Wall., 129. For an authoritative interpretation of that amendment we must look to the decisions of the supreme court of the United States. In the *Slaughter-*

*House Cases, supra*, it was held by that court that the legisla-
ture of Louisiana were not prohibited by that amendment
from prescribing and determining the localities where the busi-
ness of slaughtering animals for the city of New Orleans
might be conducted, and prohibiting their being slaughtered
anywhere else.    Page 61.    MILLER, J., giving the opinion of
the court, said: " The power here exercised by the legislature
of Louisiana is, in its essential nature, one which has been, up
to the present period in the constitutional history of this
country, always conceded to belong to the states, however it
may *now* be questioned in some of its details."    He then
quotes approvingly from Chancellor Kent the following: " Un-
wholesome trades, slaughter-houses, operations offensive to the
senses, the deposit of powder, the application of steam-power
to propel cars, the building with combustible materials, and
the burial of the dead, may all be interdicted by law, in the
midst of dense masses of population, on the general and
rational principle that every person ought so to use his prop-
erty as not to injure his neighbors, and that private interests
must be made subservient to the general interests of the com-
munity."    He then continued: " This is called the police
power. . . .    Upon it depends the security of social order,
the life and health of the citizen, the comfort of an existence
in a thickly-populated community, the enjoyment of private
and social life, and the beneficial use of property."    He then
quotes approvingly from an able opinion by REDFIELD, C. J., in
*Thorpe v. Railroad Co.*, 27 Vt., 149, the following: " It ex-
tends to the protection of the lives, limbs, health, comfort and
quiet of all persons, and the protection of all property within
the state; . . .    and persons and property are subjected to
all kinds of restraints and burdens in order to secure the gen-
eral comfort, health and prosperity of the state.    Of the per-
fect right of the legislature to do this no question ever was,
or, upon acknowledged general principles, ever can be made,
so far as natural persons are concerned."    Page 62.
    Counsel urge upon our consideration the reasoning of the

minority of the court in the *Slaughter-House Cases*. But the dissenting opinion concedes that the police power " undoubtedly extends to all regulations affecting the health, good order, morals, peace and safety of society, and is exercised on a great variety of subjects, and in almost numberless ways. . . . With this power of the state and its legitimate exercise I shall not differ from the majority of the court. . . . In the law in question there are only two provisions which can properly be called police regulations — the one which requires the landing and slaughtering of animals below the city of New Orleans, and the other which requires the inspection of the animals before they are slaughtered. When these requirements are complied with, the sanitary purposes of the act are accomplished. In all other particulars the act is a mere grant, to a corporation created by it, of special and exclusive privileges, by which the health of the city is in no way promoted." Page 87. Thus it was conceded by the minority of the court that the fourteenth amendment did not abridge nor take away the power of the state legislature to regulate all matters " affecting the health, good order, morals, peace and safety of society."

In *Bartemeyer v. Iowa*, 18 Wall., 129, it was held, in effect, by a united court, that the fourteenth amendment did not abrogate nor render nugatory a statute of Iowa prohibiting the sale of intoxicating liquors, but that the same was " within the police regulations of the states, left to their judgment, and subject to no other limitations than such as were imposed by the state constitution, or by the general principles supposed to limit all legislative power." Page 132.

In *McCready v. Virginia*, 94 U. S., 391, it was held that a law of that state prohibiting persons not citizens thereof from planting oysters in the soil covered by her tide-waters was not in violation of the constitution of the United States.

In *Munn v. Illinois*, 94 U. S., 113, affirming *S. C.*, 69 Ill., 80, it was held that the legislature of Illinois had power to regulate public warehouses, and the warehousing and inspec-

tion of grain within that state, and to enforce the same by penalties, and that such legislation was not in conflict with any provision of the federal constitution. "Police powers . . . are nothing more or less than the powers of government inherent in every sovereignty; that is to say, the power to govern men and things. Under these powers the government regulates the conduct of the citizens one towards another, and the manner in which each shall use his own property when such regulation becomes necessary for the public good. . . . Looking, then, to the common law, from whence came the right which the constitution protects, we find that when private property is affected with a public interest it ceases to be *juris privati* only. This was said by Lord Chief Justice HALE, . . . and has been accepted without objection as an essential element of the law of property ever since. Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created." Pages 125-6. The opinion of the chief justice then goes on to show that such police regulations as to such use of private property do not "deny to any person within its jurisdiction the equal protection of the laws," within the meaning of the fourteenth amendment. Pages 134–5.

In sustaining the constitutionality of the prohibitory liquor law of Massachusetts, it was held, in *Beer Co. v. Massachusetts*, 97 U. S., 25, that "all rights are held subject to the police power of the state. If the public safety or the public morals require the discontinuance of any manufacture or traffic, the hand of the legislature cannot be stayed from providing for its discontinuance by any incidental inconvenience which individuals or corporations may suffer."

In *Bradwell v. State*, 16 Wall., 130, it was held, in effect, that a law of a state was not in violation of the fourteenth amendment, because, in allowing admissions to the bar, it discriminated between citizens of equal age, character, learning and ability. So, a law of New York punishing every master of a vessel arriving from a foreign port in the city of New York who failed to report the names of all his passengers, with certain particulars of their age, occupation, last place of settlement, and place of their birth, was sustained as an exercise of the police power of the state (*City of New York v. Miln*, 11 Pet., 102, 139); and the same was approved in the *Slaughter-House Cases, supra*. See *U. S. v. De Witt*, 9 Wall., 41. With these decisions of the supreme court of the United States before us, we would not be justified in holding that the section of our statute in question is in violation of the fourteenth amendment of the constitution of the United States, or any other amendment or provision of that instrument.

3. It is urged that the statute in question is in violation of our state constitution, and hence null and void. The decisions of the supreme court of the United States, already cited, clearly recognize the inherent right of every state government, within constitutional limitations, to regulate the conduct of its citizens and the use of private property in matters pertaining to the public good. To these decisions of the federal court many might be added from state courts. For reference we cite a few: *Fry v. State*, 63 Ind., 552; *Ex parte Smith and Keating*, 38 Cal., 702; *People v. Harper*, 91 Ill., 357; *State v. Conlin*, 27 Vt., 318; *In re Ellen Dougherty*, id., 325; *Austin v. State*, 10 Mo., 591; *Intoxicating Liquor Cases*, 25 Kan., 751; *In re Ruth*, 32 Iowa, 250; *Harrigan v. C. R. L. Co.*, 129 Mass., 580; *Carter v. Dow*, 16 Wis., 298; *Tenney v. Lenz*, id., 566; *City of Milwaukee v. Gross*, 21 Wis., 241; *State ex rel. v. Ludington*, 33 Wis., 107; *Taylor v. State*, 35 Wis., 298; *Morrill v. State*, 38 Wis., 428; *Van Buren v. Downing*, 41 Wis., 122; *Milwaukee I. S. v. Milwaukee*

*County*, 40 Wis., 328; *Allerton v. Chicago*, 20 A. L. R., 473; *Cincinnati v. Bryson*, 15 Ohio, 625; *Cincinnati v. Buckingham*, 10 Ohio, 257; *Ash v. People*, 11 Mich., 347; *Boston v. Schaffer*, 9 Pick., 415; *Kitson v. Ann Arbor*, 26 Mich., 325; *Baker v. Cincinnati*, 11 Ohio St., 534; *Van Baalen v. People*, 40 Mich., 258; *State v. Hartfiel*, 24 Wis., 60.

The cases cited involve a variety of statutes, each of which has been held to be a constitutional exercise of the police power of the state. They cover cases regulating the rafting of timber, the issuing and taking up of tickets by common carriers, the playing upon musical instruments after particular hours of the night, or in specified places, the presence of females at particular places after certain hours of the night, the inspection of grain and other articles, the location of slaughter-houses and packing-houses, the sale of meat and other articles of food, the keeping of dogs, the selling or giving away of liquor, the traveling from place to place within the state and selling, or exposing for sale, goods manufactured within the state, the taking and detaining of destitute children not guilty of crime, the licensing of hackmen, omnibus drivers, and others pursuing like occupations, the occupying of a place in the market, the keeping of a stall to sell fish, the running of a theatre, the business of pawnbrokerage, and the sale of intoxicating liquors to minors. These are a few of the many things which courts have held to be subject to the police power of the state. The existence of the power has never been doubted, but the difficulty arises from its application and the limitation of its boundaries.

The manifest object of the statute in question was to suppress the business of banking or brokerage by any insolvent person, company or corporation. It therefore inflicts punishment upon persons so engaged, knowing the fact. A banker is one who traffics in money, receives and remits money, negotiates bills of exchange, receives money in trust, to be drawn

again, or its equivalent, as the owner has occasion to use it. Banking is the business or employment of the banker, or the business of the bank. A broker is one who acts as agent, middleman or negotiator between other persons. See Dictionaries. The very nature of the business prevents it from being conducted by a person isolated from all communication with others. The business, therefore, not only affects the banker or broker, but every person who deals with him as such. The business is not confined to the property of the banker or broker, but involves all property passing through his hands or entrusted to his keeping. A bank implies capital, and capital invites confidence. A man holding himself out as a banker or broker thereby gives public proclamation that he has money, and property readily convertible into money, in his possession and subject to his control, and for that reason he may be safely trusted. It requires no argument to show that such assurance is most inviting and influential with the mass of the people, especially with those unacquainted with the history and character of the man. With them the banker or broker is entrusted with money merely because he is a banker or broker, and hence supposed to have surplus capital as a standing guaranty of his agreements and his integrity. For an insolvent banker, company or corporation to continue the business of banking is to hold out assurances of responsibility and surplus capital where neither exists. To do so knowingly is to secure the confidence, and hence obtain the money, of the ignorant and unwary by an implied deception. It is the old story of securing the victim by a display of false colors. To suppress this mischief, to save the public from being induced to deposit money with such insolvent by the implied assurance of responsibility and wealth essential to the business, when they do not in fact exist, was the evident purpose of the statute. Wisconsin is not alone in the enactment of such statutes. Similar statutes exist in Illinois, Iowa, Kansas, Louisiana, California, Missouri, South Carolina, and Michigan. See

Thompson, Liability of Officers & Agents of Corporations, 560, 562, 563, 564, 549, 591, 593, 596, 648, 580. These statutes, like our own, are of recent date, and we are not aware of the constitutionality of any of them having been brought in question in any court; but the extent of the legislation seems to indicate a pretty general belief in the legislative power.

Counsel cites two sections of our constitution, each of which is claimed to be violated: "Every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive in his person, property or character; he ought to obtain justice freely, and without being obliged to purchase it, completely and without denial, promptly and without delay, conformably to the laws." Section 9, art. I. Assuming the charge against the plaintiff in error to be well founded (which we must do for the purposes of the case, even though the fact is otherwise, as it may turn out to be), then, as we have already indicated, the only ground for alleging injury, wrong or injustice to the plaintiff by reason of the statute is the punishment inflicted for knowingly obtaining money by implied deception, which would otherwise not have been punishable. The statute, however, is to prevent injury and wrong to the public, and to furnish a barrier against its commission. We are clearly of the opinion that this section of the constitution has no bearing upon the question before us. The other section referred to is section 16, art. I, which reads: " No person shall be imprisoned for debt arising out of or founded on a contract, expressed or implied." The imprisonment here is not for any debt, much less for a debt arising out of or founded on any contract, but upon a charge of an act made a misdemeanor by the statute, to wit, the receiving of money on deposit as a banker by one knowing himself or such bank to be insolvent. The case manifestly does not come within the prohibition of that section. *Cotton v. Sharpstein*, 14 Wis., 226; *In re Mowry*, 12 Wis., 52; *Howland v. Needham*, 10 Wis., 495. The design of the law seems to be healthful and

for the public good, and in our opinion it is not in violation of any express or implied provisions of the state or national constitution. Whether its enactment was wise and politic, was a matter for the legislature to determine, and not for the court.

*By the Court.*— The order of the circuit court is affirmed.