---

## In re COOK.

*(Circuit Court, E. D. Wisconsin. April 4, 1892.)*

1. **HABEAS CORPUS—INTERSTATE EXTRADITION.**
   In interstate rendition, the warrant of the executive is not conclusive of the fact of flight. The courts upon *habeas corpus* may inquire and determine the fact, and this at any time before the actual surrender of the prisoner to the demanding state.

2. **SAME.**
   The executive warrant is, however, *prima facie* evidence of flight, and, being unassailed before delivery of the prisoner to the demanding state, the surrender is lawful. The executive warrant has, upon surrender of the prisoner, spent its force. He is then held in lawful custody, under process of the state, and cannot thereafter assert that he was not a fugitive from justice.

3. **SAME—FUGITIVE FROM JUSTICE.**
   One who personally, within a state, has set in motion the machinery for crime, and departs the jurisdiction, after the commission of an act in furtherance of, but before the consummation of, the offense, is a "fugitive from justice," within the meaning of the law.

4. **SAME—TRIAL FOR OTHER OFFENSES.**
   Whether one surrendered by one state to another can be tried for any other offense than that for which he was surrendered, *quære?*

*(Syllabus by the Court.)*

Writ of *Habeas Corpus.*

### STATEMENT BY JENKINS, DISTRICT JUDGE.

On the 13th of February, 1892, upon the petition of Charles E. Cook, claiming to be restrained of his liberty by one Colden A. Hart, sheriff of the county of Dodge, state of Wisconsin, a writ of *habeas corpus* was issued out of this court, to which the sheriff made due return, which the petitioner duly traversed. The facts disclosed by the record, so far as essential to the determination of the matter, are substantially these:

On the 5th day of March, 1891, one George W. Morse complained to a justice of the peace of the county of Dodge that the petitioner, Charles E. Cook, and one Frank Leek, on the 7th of May, 1889, opened a bank at Juneau, in the county of Dodge, styled the "Bank of Juneau," and entered upon and engaged in a general banking business, having a pretended capital of $10,000, and continued in such business, soliciting and receiving deposits up to and including the 20th day of June, 1890, upon which day the bank closed its doors and failed. That Cook was the principal owner of such bank, owning nine-tenths interest therein, Leek owning one-tenth interest therein. That Cook was an officer of the bank, and had the general supervision of the business, which was transacted either by him personally, or, under his order and direction, by one Richardson, acting as his agent. That from January 6, 1890, to

June 20, 1890, Cook, by the inducements and pretenses so held out by him, received and accepted on deposit, from citizens of the county, money to the amount of $25,000. That this was done by the express order and direction of Cook, and with his full knowledge; and that no part of said amount has been paid or returned to the depositors. That on the 6th day of January, 1890, Cook and Leek and the bank were severally insolvent, and have since so continued, and that such insolvency of the parties and of the bank was well known to Cook on and ever since the 6th of January, 1890; and that, at the time of receiving all the deposits stated, Cook knew, and had good reason to know, that he and Leek and the said bank were each and all of them unsafe and insolvent. That on the 20th of June, 1890, at Juneau, in the county of Dodge, Cook, as such banker, did accept and receive a deposit in said Bank of Juneau from one Herman Becker, a resident of the county of Dodge, of $175, which has never been paid or returned; and that, at the time of receiving such deposit, Cook knew, and had good reason to know, that he and the said Frank Leek and the said Bank of Juneau were each and all of · them unsafe and insolvent, and that such deposit from Becker, and all the other deposits mentioned, were received by Cook with intent to cheat and defraud, contrary to the statute of Wisconsin. Thereupon the justice of the peace to whom the affidavit and complaint had been presented issued the usual warrant for the arrest of Cook, upon which, accompanied with several affidavits in support of the principal charge; and also upon an affidavit of the then sheriff of the county of Dodge, who states certain ineffectual attempts to find Cook in the city of Chicago, and who states "that he knows that said Charles E. Cook was at said times, and now is, a fugitive from justice;" and also upon the application of the district attorney for the county of Dodge, who states that "said Charles E. Cook is a fugitive from justice, and has fled from the justice of the state of Wisconsin, and avoided arrest,"—the governor of the state of Wisconsin, on the 9th day of March, 1891, issued his requisition upon the governor of the state of Illinois, requiring the apprehension of the said Cook, and his delivery to an agent deputed to receive and convey him to the state of Wisconsin. That requisition was honored by the executive of the state of Illinois, who issued his warrant on the 10th day of March, 1891, to the proper peace-officers of that state, reciting that the executive authority of the state of Wisconsin had demanded the apprehension and delivery of Charles E. Cook, "represented to be a fugitive from justice," and had produced and laid before him authenticated copies of the charge hereinbefore recited, and requiring the officers to whom the warrant was addressed to arrest and secure the said fugitive, Charles E. Cook, if to be found within the limits of the state, and to deliver him into the custody of the agent of the executive authority of the state of Wisconsin, appointed to receive the said fugitive. Under such warrant Cook was arrested by the sheriff of the county of Cook, in the state of Illinois, and delivered to the agent of the executive authority of Wisconsin, who conveyed him to the county of Dodge, in the state of Wisconsin, where he was examined before the magistrate issuing the warrant,

and held to answer to the charge. Subsequently, and in November, 1891, the district attorney filed his information against the petitioner, Cook, setting forth the offense charged in the original complaint before the magistrate, upon which he was arraigned, and to which he was compelled to plead, and held to bail in the sum of $5,000. Afterwards, and prior to the writ of *habeas corpus*, Cook was surrendered by his bail, and was held by the sheriff of the county of Dodge under process issued out of the said court, to answer the charge. At the February term, 1891, of the circuit court of Dodge county, the grand jury of the county presented seven indictments against the petitioner, Cook, charging him with different violations of the criminal laws of the state of Wisconsin, some for larceny, some for embezzlement, and some for receiving deposits in the bank, knowing the bank to be unsafe and insolvent. All these offenses are charged to have been committed in connection with this business of banking; the times of the alleged offenses varying, but all charged to have been committed between the 3d and 20th days of June, 1890. To the several indictments Cook was required to plead, and under them he was held to bail, and subsequently, and before this writ of *habeas corpus*, by his bail surrendered to the sheriff, in whose custody he was at the time of the issuance of the writ. The sheriff justified his detention of Cook under the writs issued upon the information and the several indictments stated.

It was established upon the hearing, to the satisfaction of the court, that Cook, for some years prior to the 20th of June, 1890, and for some years prior to his arrest upon the warrant of the executive of Illinois, had been, and still is, a resident of the city of Chicago, in the state of Illinois; that he had made occasional visits to the state of Wisconsin in connection with his banking business at Juneau and elsewhere; that he left Chicago on the 17th day of June, and went to Hartford, in the county of Washington, state of Wisconsin, where he spent the whole of the 18th day of June, thence proceeding to Beaver Dam, in the county of Dodge, where he was engaged during the whole of the 19th of June in business not connected with the Bank of Juneau; that early on the morning of the 20th of June, he left Beaver Dam, and made a continuous journey to Chicago, arriving there at 2 P. M. of the 20th, and did not, on the occasion of that visit to Wisconsin, visit or pass through the village of Juneau, and had not been at Juneau for some three weeks prior to the closing of the doors of the bank on the 20th of June. It was also conceded at the hearing that the particular deposit by Herman Becker, charged in the complaint upon which the requisition proceedings were had, was actually made at 4 o'clock in the afternoon of the 20th of June, and after the petitioner's arrival in Chicago. It is also proper to state that the petitioner testified at the hearing that he was a large stockholder in the Park National Bank of Chicago, which was closed by the comptroller of the currency on the 20th day of June, 1890; that he left Beaver Dam for Chicago upon a telegram stating that trouble existed with reference to that bank; that that bank was in fact solvent, and has paid all its debts, and that it should not have been closed by the comptroller;

that the closing of that bank compelled the closing of the doors of the Bank of Juneau; that up to that time, as he claims, not only the Bank of Juneau, but that he and Mr. Leek, were solvent, and that their subsequent insolvency was brought about by the improper closing of the Park National Bank.

*Chas. H. Aldrich* and *Jos. V. Quarles*, for petitioner.

*W. C. Williams* and *P. G. Lewis*, Dist. Atty., for respondent.

Before GRESHAM, Circuit Judge, and JENKINS, District Judge.

JENKINS, District Judge, (*after stating the facts as above.*) The record presents for consideration several grave and important questions: *First.* Whether it be competent for the judicial tribunals to review the action of the executive of Illinois in issuing his warrant. *Second.* If his action be subject to review, whether that action can be inquired into after the surrender of the alleged fugitive from justice, and when he is held under state process. *Third.* Whether the petitioner was a fugitive from justice. *Fourth.* Whether, assuming the legality of the proceeding for his rendition, he can be held or tried upon any other charge than that for which he was surrendered.

Undoubtedly, as between independent sovereignties, the surrender of fugitives rested merely in comity, and was confined to those whose crimes "touched the state," or were so enormous as to make them *hostes humani generis.* Vattel, book 1, c. 19; Vattel, book 2, c. 6. If there existed any moral obligation, it was quite imperfect, and was not recognized by the law of nations. The surrender could not be demanded as of right; but as Mr. Marcy observes in his Hulsemann letter, "comity may sometimes yield what right withholds." So, also, before the Revolution, a criminal fleeing from one colony found no protection in another. He was arrested wherever found, and sent for trial to the place of his offending; and this without formal compact, treaty, or agreement between the colonies. *Com.* v. *Deacon,* 10 Serg. & R. 129. In all such cases the manner in which he was brought within the jurisdiction could not be pleaded by the prisoner as a defense to the crime with which he was charged, or as ground for his discharge without trial. Each sovereignty had the right to determine for itself whether a fugitive from the justice of another sovereignty should find refuge within its jurisdiction; and, if it so pleased, to deliver the fugitive to the sovereignty whose justice he had offended. Every independent nation possesses, in absence of positive law, or of treaty obligation, the inherent right of expulsion of undesirable inhabitants. So, also, the prisoner could not rightly urge, by way of defense or in abatement, that he was forcibly and by abduction brought within the jurisdiction from a foreign country. The violation of the sovereignty of an independent nation is matter which touches the political relations of the two countries, and is of no concern to him. He may have, it is true, recourse in the law for the forcible abduction, but the manner of his subjection to the jurisdiction does not impair that jurisdiction, nor avail the prisoner against responding for his offense. *Ex parte Scott,* 9 Barn. & C. 446; *State* v. *Brewster,*

7 Vt. 118; *Doms' Case*, 18 Pa. St. 37; *Ker* v. *Illinois*, 119 U. S. 436, 7 Sup. Ct. Rep. 225. It is, however, more than doubtful whether in those countries where the common law prevails, and where personal liberty is the chief concern of the state, and is protected by constitutional safeguards, there exists any power, in the absence of treaty,—which is a law of the land, (*U. S.* v. *Rauscher*, 119 U. S. 407, 7 Sup. Ct. Rep. 234,) —to make surrender of a fugitive. It is true that such surrender was made by this government in 1864, in the case of Arguelles. In that case no opportunity was permitted by writ of *habeas corpus* to test the legality of the seizure. The action of the executive was severely criticised, and was sought to be justified upon the ground that "a nation is never bound to furnish asylum to dangerous criminals who are offenders against the human race." Possibly the nature of the offense—selling human beings into slavery—may have induced the action of the executive, and may extenuate an act which is opposed to the holding of the state department from an early date to the present time, and to the declared opinions of such eminent statesmen as Albert Gallatin, John Quincy Adams, Mr. Livingston, Mr. Forsyth, Mr. Calhoun, Mr. Cass, Mr. Marcy, Mr. Hamilton Fish, Mr. Evarts, Mr. Frelinghuysen, and Mr. Bayard, and would seem a violation of the fundamental law that no man "shall be deprived of life, liberty, or property without due process of law." In most civilized countries the imperfect moral obligation to surrender fugitives from justice has, by force of treaties, ripened into absolute duty. It cannot now be doubted that in those countries dominated by the common law extradition can only be had as provided by treaty, and for those offenses only denominated in the treaty.

The question of interstate rendition rests, however, upon different ground. The states are not, in respect to the surrender of fugitives, independent sovereignties. They cannot contract with each other for such surrender. By the compact of union they have yielded their sovereignty in that regard to the federal government. Such rendition of fugitives can only be rightfully effected under the provisions of the federal constitution, and the laws passed in pursuance thereof. That constitution provides (subsection 2, § 2, art. 4) that "a person charged in any state with treason, felony, or other crime, who shall flee from justice and be found in another state, shall, on demand of the executive authority of the state from which he fled, be delivered up, to be removed to the state having jurisdiction of the crime." Whether, since the constitution, a fugitive forcibly abducted from one state and delivered into the jurisdiction of another can be held for trial in the latter, may perhaps be an open question. In *Mahon* v. *Justice*, 127 U. S. 700, 8 Sup. Ct. Rep. 1204, such a case was presented to the supreme court. It was held by the court, Justice BRADLEY and Justice HARLAN dissenting, that no right secured under the constitution of the United States had been violated by such abduction, and the federal court could not interfere, "whatever effect may be given by the state court to the illegal mode in which the defendant was brought from another state." Notwithstanding some expressions in the opinion of the court which would

seem to assert the lawful jurisdiction of the state courts under such circumstances, the point ruled is that no federal question was involved. Upon the main question the authorities are not in accord. It is happily not necessary for us to consider that question here. This constitutional provision was adopted, as one author has expressed the thought, that "the law might everywhere and in all cases be vindicated." The duty imposed is imperative, taking away all discretion, in case of an executive demand, "and makes that a matter of duty which else had been a matter of grace." Chief Justice Gibson, *Dows' Case*, 18 Pa. St. 37. See, also, *In re Voorhees*, 32 N. J. Law, 145. The constitutional provision not being self-executing, congress provided for its enforcement by act of 12th February, 1793, preserved as section 5278 of the present Revision. It was thereby enacted that—

"Whenever the executive authority of any state or territory demands any person as a fugitive from justice of the executive authority of any state or territory to which said person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any state or territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of the state or territory from whence the person so charged has fled, it shall be the duty of the executive authority of the state or territory to which such person has fled to cause him to be arrested and secured, and to cause notice of the arrest to be given to the executive authority making such demand, or to the agent of such authority appointed to receive the fugitive, and to cause the fugitive to be delivered to such agent when he shall appear. If no such agent appears within six months from the time of the arrest, the prisoner may be discharged. All costs or expenses incurred in the apprehending, securing, and transmitting such fugitive to the state or territory making such demand shall be paid by such state or territory."

It is apparent that the act provides no means to compel the performance of the obligation enjoined, and that the duty of the executive upon whom demand is made is imperative. Whenever the executive of a state shall demand any person as a fugitive from justice of the executive of the state to which such person has fled, and shall produce a copy of the charge, certified by the executive of the state from whence the person so charged has fled, it shall be the duty of the executive of the state to which such person shall have fled to cause his arrest and surrender to the demanding state. The certificate of the executive authority of the demanding state is conclusive as to the charge of crime. The executive of the state where the fugitive is found has no right to look behind it, or to question it, or to inquire into the character of the crime charged. *Com. v. Dennison*, 24 How. 66. Whether the person demanded be a fugitive from justice is a question of fact to be determined in the first instance by the executive of the state upon whom demand is made, upon such evidence as he may deem satisfactory. *Roberts v. Reilly*, 116 U. S. 80, 95, 6 Sup. Ct. Rep. 291. But this investigation is purely *ex parte*, the demanded person having no right of opportunity to be heard. Here there was no finding by the executive in terms that Cook was a fugitive from justice. The recital in the writ is:

"The executive authority of the state of Wisconsin demands of me the apprehension and delivery of Charles E. Cook, represented to be a fugitive from justice." It is, however, ruled that the issuance of the warrant of rendition is of itself *prima facie* finding of the fact of flight, and sufficient to justify the removal until the presumption in its favor is overthrown by contrary proof. *Roberts* v. *Reilly, supra.* That decision by its very terms implies that the action of the governor is only presumptively regular, and can be reviewed by the courts. Surely it cannot be claimed that such action is conclusive upon personal right, and may not be inquired of by judicial tribunals. Surely it cannot be that the right to personal liberty hangs upon so slender a thread as the arbitrary will of the authorities of the demanding and surrendering states. "No person shall be deprived of life, liberty, or property without due process of law." That is the fundamental law of the land, coming to us from *Magna Charta.* It is not due process of law which condemns without hearing, which convicts without trial. The phrase "due process of law," or its synonym, "law of the land," cannot have better definition than that given by Mr. Webster in the *Dartmouth College Case:*

" By ' law of the land ' is most clearly intended the general law,—a law which hears before it condemns, which proceeds upon inquiry, and renders judgment only after trial. The meaning is that every citizen shall hold his life, liberty, property, and immunities under the protection of the general rules which govern society." *Dartmouth College* v. *Woodward,* 4 Wheat. 518.

It is essential to compliance with such executive demand that the person whose surrender is demanded should be adjudged a fugitive from the justice of the demanding state. The decision of the executive is not conclusive of that fact. And so we are of opinion that the action of the executive is reviewable by federal tribunals, and that it is competent for the courts to determine whether in fact the demanded person is a fugitive from justice. *In re Manchester,* 5 Cal. 237; *Ex parte Joseph Smith,* 3 McLean, 121; *Jones* v. *Leonard,* 50 Iowa, 106; *In re Mohr,* 73 Ala. 503; *Hartman* v. *Aveline,* 63 Ind. 353; *Wilcox* v. *Nolze,* 34 Ohio St, 520, 521.

But it is said that here the petitioner has been rendered to the demanding state, and is now held, not under the constitutional provision, but by virtue of state process. In other words, that the act of rendition has been consummated; that the federal process has spent its force, and is *functus officio;* that the writs of the state control the custody of the petitioner, and no federal question is here involved. In respect of this question we are without the decisive guidance of the ultimate judicial authority. We are referred to but two cases in the subordinate courts, and in these cases the judges seem to have arrived at opposite conclusions. In the *Case of Noyes,* 17 Alb. Law J. 407, before Judge Nixon, of the district of New Jersey, it was held that a fugitive from justice, extradited from one state in the Union to another, may be detained for prosecution, notwithstanding it may appear that the arrest under the rendition proceedings was without legal authority. In *Tennessee* v. *Jackson,* 36 Fed.

Rep. 258, Judge KEY reached an opposite conclusion, and held that, as the petitioner had never been in the demanding state, he could not be a fugitive from the justice of that state, and that the jurisdictional question could be asserted after his rendition had been accomplished, and he was held under process of the demanding state. The proceedings here were instituted by the state now claiming jurisdiction of the petitioner. The custody of him has been obtained solely by virtue of that demand. He is subjected to the custody of the state of Wisconsin by the power of the United States, acting through the executive of Illinois at the instance and upon the demand of the state of Wisconsin. It is insisted for the petitioner that, if he was not in fact a fugitive from justice, the executive of Illinois was without jurisdiction to yield him to the state of Wisconsin; that the latter state cannot claim any benefit of its unauthorized act, and hold him under its process, because such custody was obtained by the wrongful act of the state, in violation of the supreme law of the land. It is said that in such case, when the original proceeding by which one is brought within the jurisdiction is unauthorized by law, the detention is improper, although sought to be justified under process valid within the jurisdiction to which the party has been unlawfully brought; that, wanting the jurisdictional fact of flight, the proceeding was *coram non judice;* that the question of flight, being jurisdictional, is open to inquiry as well after as before the surrender; that the petitioner is physically within the state because compelled by the supreme law unlawfully put in operation, but that he is not here for the purpose of jurisdiction by the state so unlawfully, under guise of the law, obtaining the possession of his body. Upon the other hand, it is urged that the executive had the right, in the first instance, to determine the question of flight upon such evidence as to him was persuasive of the fact; that his warrant, unassailed, is sufficient to justify the removal and surrender of one charged with crime, and is a perfect justification for the arrest and custody of the alleged offender; that the surrender of his body to the demanding state by virtue of such warrant was lawful; that upon surrender the warrant had spent its force, and thereafter the prisoner is in custody rightfully, not by virtue of the warrant, but under process of the state; and that, therefore, no federal question is involved.

We are of opinion that the contention in behalf of the petitioner cannot be sustained. The vice of this position is in the assumption that the fact of flight is jurisdictional in the sense that executive action is void if, in point of fact, the demanded person be not a fugitive from justice. The power to act upon a given state of facts, and to decide whether that state of facts exists, constitutes jurisdiction. The decision therein is conclusive until properly set aside. The constitution and the act of congress have lodged with the executive of the state upon whom proper demand is made for one alleged to be a fugitive from justice the jurisdiction to determine whether the person so charged be such fugitive, and his determination is sufficient to justify the surrender. He has, by virtue of the law and of the action of the executive of the demanding state,

jurisdiction of the subject-matter. He has jurisdiction of the person of the petitioner by virtue of his presence within the state. His determination partakes of the nature of a judicial proceeding. It is true, his action is *ex parte*. Therefore it is that the courts will review his determination. But that fact is not availing to destroy jurisdiction. He may err, but—to use the expression of Chief Justice RYAN—he had "jurisdiction to commit the error." His determination of the fact of flight, evidenced by the issuing of his warrant, suffices to justify the removal until the presumption in its favor is overthrown by contrary proof in a proper proceeding. *Roberts v. Reilly*, 116 U. S. 80–95, 6 Sup. Ct. Rep. 291. His warrant, unassailed by competent authority, is complete justification for the arrest and surrender of the alleged fugitive. When so delivered by virtue of such warrant, his surrender is lawful, and the demanding state obtains rightful possession of his person, and may lawfully subject him to its criminal process for the offense charged. The executive warrant has then spent its force. It is no longer operative. The alleged offender is no longer subjected to deprivation of liberty by virtue thereof, but is rightfully held under the process of the state. When that has happened, no federal question remains. If the fact of flight be jurisdictional in the sense that it must exist as essential to the validity of any action by the executive, then it must always remain open to inquiry,—as well after surrender as before; as well after trial and conviction as before; as well after sentence as before; as well during imprisonment upon conviction and sentence as before surrender or trial,—for the reason that upon such postulate the executive would not have jurisdiction because he so determined; and any inquiry by *habeas corpus*— the only means of review of his decision—would not bar another writ. In such case, also, the officer executing the warrant of the executive would not be justified by the writ, but by the jurisdictional fact of flight upon which the writ is predicated, and which, if the jurisdictional fact did not exist, would be mere waste paper. Such confusion, necessarily resulting from such holding, is not to be lightly entertained. It cannot be assumed that any such meaning of the constitutional provision or the act of congress was possible to the minds of the framers. The fact of flight may be in a sense jurisdictional to removal, as one says a criminal court has jurisdiction only of crime. But such court has jurisdiction to determine whether a certain act charged to have been committed is or is not a crime. Its decision therein, although erroneous, is not void. So here, the jurisdiction to determine the fact of flight is lodged with the executive. He has jurisdiction of the subject-matter. His warrant is valid until his determination of the fact of flight is properly reversed. When, therefore, such valid warrant has been executed, the surrender thereunder is lawful, and the party lawfully subjected to the state jurisdiction.

It was urged in argument that under such ruling there will exist opportunity for oppression; that the executive may be imposed upon by *ex parte* and false evidence, and the warrant be improvidently issued; and that so it may happen, as was the case in *Tennessee* v. *Jackson, supra,*

that one be surrendered who was never in the demanding state, and could not, therefore, be a fugitive from its justice. This is possible, but the remedy would seem to rest with the executive to take action to allow the prisoner proper opportunity to appeal to the law. Possibly the case stated would be deemed such a fraud upon the law as to bring it within cognizance of the courts.

If, however, we should prove to be in error in our conclusion, and the question of flight remains open for consideration notwithstanding the surrender under the warrant, we are persuaded that here the executive warrant was providently issued, and the surrender justified by the facts and the law.

We come now to the consideration of the question whether the petitioner was a fugitive from justice within the intendment of the constitution. In this connection it is insisted for the petitioner that it was impossible for him to have committed the crime charged against him, because it is conceded that he was not within the state of Wisconsin at the time of, or voluntarily after, the receipt of the deposit charged, and could not therefore be a fugitive from justice. The law of Wisconsin (Rev. St. Wis. § 4541) renders it criminal for any officer, director, stockholder, cashier, teller, manager, messenger, clerk, or agent of any bank to accept or receive on deposit or for safe-keeping any deposit of money when he knows, or has good reason to know, that such bank is unsafe or insolvent. In construing the act, regard must be had to the mischief sought to be prevented. The purpose of the law is manifest. The act was designed to prevent fraudulent banking, and to protect the public from dealing with such unsafe or insolvent concerns. The manual receipt of the deposit is but one step, and the final step, in the consummation of the offense. There must precede the unsafe and insolvent condition the representation of safety and solvency, and the knowledge of the unsafe and insolvent condition. These are the essentials of the offense. The receipt of the deposit may be by an innocent instrument of a guilty officer of the bank. It is a criminal act to hold out an insolvent bank as safe or solvent, effective to the consummation of crime upon the receipt of the deposit. The open door of a bank is an invitation to depositors. The open door of a bank is a representation to the public that the bank is safe and solvent. The keeping open of a bank by the superintending officer or proprietor is an authority to his clerks to receive deposits. If the doors are opened for the purposes of business, with guilty knowledge by him of the unsafe or insolvent condition of the bank, and a deposit is received by his agents, it is received by him. It was his act, for which he must respond to the law. His actual presence at the time is unessential. In contemplation of law, he is present by his agent deputed to perform the wrongful act he has planned. It was his act as certainly as though he personally received the deposit. *State* v. *Caldwell*, (Sup. Ct. Iowa,) 44 N. W. Rep. 700. His will contributed to the wrong-doing, and he is responsible for the act done by his agent by his authority, the same as though performed by himself alone. It is because his will set the force in motion that was operative to crime. Thus, Mr. Bishop observes, one may commit

an offense against a state upon whose soil he has never set his foot, as in putting forth a libel, (*Com.* v. *Blanding*, 3 Pick. 304,) or a threatening letter, (*Esser's Case*, 2 East, P. C. 1125,) or a letter inclosing a forged instrument to defraud the one to whom it is addressed, (*People* v. *Rathbun*, 21 Wend. 509,) or a letter making a false pretense to one who parts with his goods in the place of the receipt of the letter, (*Reg.* v. *Jones*, 1 Eng. Law & Eq. 533; *Reg.* v. *Leech*, 36 Eng. Law & Eq. 589; *Norris* v. *State*, 25 Ohio St. 217.)  But it is objected that the charge is that the petitioner received the deposit, and therefore his personal presence was essential to the commission of the act charged.  The objection is untenable.  "The act may be charged directly as his act, and proof that he did the act through the agency of another will sustain a conviction." *State* v. *Caldwell*, *supra*.

In *Roberts* v. *Reilly*, 116 U. S. 80-97, 6 Sup. Ct. Rep. 291, the supreme court defines the phrase "fugitive from justice," and declares that, to be a fugitive from justice in the sense of the act of congress regulating the subject, "it is not necessary that the party should have left the state in which the crime is alleged to have been committed, after an indictment found, or for the purpose of avoiding a prosecution, anticipated or begun, but simply that, having within a state committed that which by its laws constitutes a crime, when he is sought to be subjected to its criminal process to answer for his offense he had left its jurisdiction, and is found in the territory of another."  In other words, there need be in his departure from the state no element of conscious flight.  It suffices that after the commission of the offense he has merely departed the jurisdiction of the state.

The question then recurs: Was the petitioner within the state of Wisconsin, within the intendment of the law, at the time of the commission of the alleged offense?  In *Ex parte Reggel*, 114 U. S. 642-653, 5 Sup. Ct. Rep. 1148, it was ruled that the proof tendered the executive made a *prima facie* case of flight.  There, as here, the statement was only that the person demanded "was a fugitive from justice," without statement of probative facts.  In *Roberts* v. *Reilly*, *supra*, the supreme court—referring to the question of flight—also declared that "the determination of the fact by the executive of the state in issuing his warrant of arrest upon the demand made on that ground, whether the writ contains a recital of an express finding to that effect or not, must be regarded as sufficient to justify the removal until the presumption in its favor is overthrown by contrary proof."  Presumably, therefore, this petitioner was a fugitive from justice.  The *onus* is cast upon him to satisfy the court that he was not.  He claims that it is conclusively established that he was not such fugitive, because he was not within the demanding state at the time the deposit was made.  He has certainly established that fact; but is that conclusive that he was not a fugitive from justice? Or, to express the proposition differently, is one who within the jurisdiction hath set in motion the machinery for crime, and departs the jurisdiction before the consummation of the crime, a fugitive from justice? When the criminal act charged is one as to which it is essential that sev-

eral acts or facts should concur, and which may occur at different times, if the party charged commits within the state any one of the acts constituting the crime, but departs the state before the happening of other acts contemplated and authorized by him, or upon the happening of events necessarily resulting from his act, can he be deemed a fugitive from justice? We are of opinion that he must be so regarded. The purpose of the constitutional provision was that criminals should find no asylum within any state of the Union; that "the law might everywhere and in all cases be vindicated." It will not do to refine too curiously upon such enactments, so that the very design of the law shall prove abortive, so that that shall become a shield and a protection which was designed as a weapon of offense. Can it be that one may not be regarded a fugitive from justice who within a state hires another to kill and murder, but before the killing departs the jurisdiction to avoid the consequences of the murder he has designed? Can it be that, if one within a state makes false representations to procure the goods of another, and departs the state before that other actually parts with his property on the faith of these representations, he may not be deemed a fugitive from justice? Or, to use the forcible illustration of counsel at the argument, if one places a dynamite bomb with clock attachment upon the premises of another, that will explode only after the lapse of a certain time, and death results, so that the act is murder, but departs the state before the explosion to avoid the consequences of his act, is he not to be regarded as a fugitive from justice? To put the question is to answer it. The subsequent event was the consequence of the act, naturally resulting from it. The subsequent event was designed to happen from and by reason of the act done. The event, when it occurs as the consequence of the act, gives quality to the act, rendering it criminal. The result was the foreseen and designed consequence of the act, stamping it as a crime. It is immaterial whether the agency employed be an inanimate object or a sentient being. The result was designed by and naturally flowed from his original act, which, by reason of the result, and the foreseen and intended consequence, is criminal. Departure from the jurisdiction after the commission of the act, in furtherance of the crime, subsequently consummated, is a flight from justice within the meaning of the law. So here, if, as charged, this bank was insolvent or unsafe on and after the 6th day of January, 1890, and if, as charged, Cook had guilty knowledge thereof, and notwithstanding authorized, sanctioned, and directed the keeping open of the bank, and the receipt of deposits, he must be deemed a fugitive from justice, although he departed the state before the deposit was actually received.

The petitioner has not shown that the bank was not insolvent as charged. He has not shown that he was unaware of its condition. He has merely shown that he was a stockholder in the Park National Bank to the amount of $19,000; that that bank was improvidently closed, and has since paid its debts. He has not shown, however, that its capital was unimpaired so that his interest therein was intact. He has not shown that the Bank of Juneau or its owners possessed any means to

meet the $25,000 of deposits charged to have been received. Nor has he shown that the closing of the Park National Bank was the occasion of any loss to the Juneau Bank, or necessarily prevented the continuance of its business. If the complaint lodged against him, and upon which he was surrendered, be true, this bank was insolvent on and after the 6th day of January, 1890, to the knowledge of Cook. Between that date and the closing of the bank on June 20, 1890, deposits were received to the amount of $25,000, which were owing depositors at the time of closing the doors. At that time its entire assets consisted of $3,048 in cash and $2,000 in securities, and Cook is charged to have withdrawn all the capital and all of the deposits except the amount of the assets stated. And on the 23d of June the proprietors of the bank assigned. These allegations we must regard, under the ruling of the supreme court, so far as they bear on the question of flight, as presumptively true. They have not been contradicted. Cook has merely shown that his interest in the Park National Bank was put in jeopardy. But stock in one bank is not capital in another. He has failed to declare what became of the capital of the Juneau Bank, or of the deposits received. He has failed to account for the meagre assets of the bank. So, upon this showing, and in the face of the *prima facie* evidence of flight derived from the action of the executive of Illinois in issuing his warrant of rendition, we are bound to assume, for the purposes of this hearing, with a view to ascertain if he may be regarded a fugitive from justice, that when last within the state of Wisconsin, some two or three weeks prior to the closing of the bank, that bank was unsafe and insolvent, to his knowledge, and was by his direction thereafter kept open for business with the design that his servants should take and receive deposits; that he designed the fraud which was consummated by the actual receipt of the deposit, departing the jurisdiction intermediate the design and the act to accomplish that design and the actual receipt of the deposit. He was, therefore, in our judgment, a fugitive from justice within the intendment of the law.

It is further urged that, being rendered by the executive of Illinois for trial upon the offense charged, Cook cannot be held or tried upon any other charge until he has had proper opportunity to return to the state of Illinois. It was held in *U. S.* v. *Rauscher*, 119 U. S. 407, 7 Sup. Ct. Rep. 234, that when one was extradited by the government of Great Britain, under a treaty, for trial upon the particular offense charged, he cannot lawfully be tried for any other offense; that he is clothed with the right to exemption from trial for any other offense, until he has had opportunity to return to the country whence he was taken for the purpose alone of trial for the offense specified in the demand for his surrender. If the principles of extradition are applicable and controlling in interstate rendition, this ruling must be held to determine the right of exemption, notwithstanding the decision of the supreme court of Wisconsin in *State* v. *Stewart*, 60 Wis. 587, 19 N. W. Rep. 429. It is not essential, however, that we should at this time pass upon this question, as the petitioner must be remanded to the jurisdiction of the state court.

If, after trial upon the charge upon which he was surrendered, he should be held upon another charge, or should be placed upon trial for such other charge before his trial upon the charge for which he was surrendered, the federal tribunals will be accessible to him, if his right be thereby invaded.