# THE SUPREME COURT

OF THE

# STATE OF NEVADA

## JANUARY TERM, 1909

[No. 1795]

### EX PARTE PITTMAN

1. BANKS AND BANKING—RIGHT TO ENGAGE IN BUSINESS.
   Banking is a lawful business, in which it is the inherent right of every citizen to engage.

2. BANKS AND BANKING—REGULATIONS—LEGISLATIVE POWER.
   The banking business can be regulated, but not prohibited, and it is not only the legislature's power, but its duty, to regulate the business so as to reduce failures to a minimum.

3. BANKS AND BANKING—INSOLVENT BANKS—RECEIPT OF DEPOSITS—PENALTY—PURPOSE.
   The purpose of statutes making it a crime to receive deposits when a bank is known to be insolvent is not only to protect innocent depositors, but to deter bank officers from so conducting a bank as to endanger its solvency.

4. EMBEZZLEMENT—BANKS.
   Prior to the act of March 29, 1907, making it a crime to receive deposits when the bank is known to be insolvent, the general laws, making it a crime for any one to wrongfully convert property of another to his own use, applied to bank officers who embezzled bank funds, the same as other embezzlers.

5. STATUTES—CONSTRUCTION—JUDICIAL FUNCTION.
   A court has no legislative powers, and cannot read into a statute something beyond the manifest intention of the legislature as gathered from the statute; its function being to determine the legislature's intention from the language used in accordance with the established rules of statutory construction.

6. BANKS AND BANKING—INSOLVENT BANKS—RECEIPT OF DEPOSITS—LEGISLA-
TIVE POWER.
    The legislature as an exercise of police power can impose a penalty
    for the conduct of business by an insolvent bank.

7. STATUTES—PENAL STATUTES—SPECIAL LAWS.
    The act of March 29, 1907, making it a crime to receive bank depos-
    its knowing the bank to be insolvent, is not unconstitutional, as being
    a special law for the punishment of offenses.

8. CONSTITUTIONAL LAW—CLASS LEGISLATION.
    Neither is the law objectionable as class legislation.

ORIGINAL PROCEEDING. Application by W. B. Pittman, on behalf of T. B. Rickey, for a writ of *habeas corpus*. **Prisoner remanded.**

STATEMENT OF FACTS

This is an original proceeding in *habeas corpus*. The writ in this case was heretofore issued upon a duly verified petition in behalf of T. B. Rickey, alleging that he was unlawfully confined and restrained of his liberty by the sheriff of Ormsby County. From the return upon the writ it appears that the said T. B. Rickey was at the time of its issuance held in custody by said sheriff upon bench warrants regularly issued by the First Judicial District Court of the State of Nevada, in and for Ormsby County, upon seven indictments found by the grand jury of said county, six of which having been found on the 27th day of February, 1908, and one thereof having been found on the 3d of March following; that all of said indictments charged the said T. B. Rickey with the crime of embezzlement contrary to the provisions of that certain act of the legislature of this state entitled "An act making any banker, or any officer, agent, or clerk of any bank, receiving deposits, knowing that said bank is insolvent, guilty of embezzlement, and providing for the punishment thereof," approved March 29, 1907. (Stats. 1907, p. 414, c. 189.)

This case was heretofore orally argued and thereafter finally submitted on briefs, together with Cases Nos. 1781 and 1790, on the 17th day of December, 1908.

Petitioner's contention in this case is that the said T. B. Rickey was unlawfully restrained of his liberty for the reason that the said act, for the violation of which said indictments were found, is in contravention of the State and Federal Con-

stitutions, and is void, and hence that he is not charged with an offense against the law.

The above-entitled statute contains two sections reading as follows:

"Section 1.    Every officer, agent, teller, or clerk of any bank, and every individual banker, or agent, teller or clerk of any individual banker, who receives any deposits, knowing that such bank or association or banker is insolvent, shall be guilty of embezzlement.

"Sec. 2.    Every person, officer, agent, teller or clerk convicted under the provisions of this act shall be imprisoned in the state prison for not less than one or more than fifteen years."

*James F. Peck* and *W. B. Pittman*, for Petitioner:

I.    The act of March 27, 1907, is unconstitutional, null and void, in that it violates the provisions of the fourteenth amendment to the Constitution of the United States, wherein it is provided: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

II.    The said statute is unconstitutional, null and void, in that it violates the provisions of article IV, section 20, of the Constitution of the State of Nevada, wherein it is provided: "The legislature shall not pass local or special laws for the punishment of crimes or misdemeanors."

III.    Said statute is unconstitutional, null and void, in that it violates the provisions of article IV, section 2, of the Constitution of the State of Nevada, wherein it is provided: "In all cases enumerated in the preceding section, and in all other cases where a general law can be made applicable, all laws shall be general and of uniform operation throughout the state."

IV.    The said statute is unconstitutional, null and void, in that it violates the provisions of article IV, section 17, of the Constitution of the State of Nevada, wherein it is pro-

vided: "Each law enacted by the legislature shall embrace but one subject and matters properly connected therewith, which subject shall be briefly expressed in the title."

V. Said statute is unconstitutional, null and void, in that it violates the provisions of article I, section 8, of the Constitution of the State of Nevada, wherein it is provided: "No person * * * shall be deprived of life, liberty or property without due process of law."

VI. Said statute is unconstitutional, null and void, in that it violates the provisions of article I, section 14, of the Constitution of the State of Nevada, wherein it is provided: "There shall be no imprisonment for debt except in cases of fraud, libel or slander."

VII. Said statute violates the said provisions of the United States Constitution hereinbefore specified, in that it makes a crime of the doing of an act which it is the right of every citizen of the United States to do when the act is done without the accompaniment of fraud, intent to defraud, or criminal negligence, and said statute does not require fraud, or the intent to defraud, or criminal negligence as an element of said crime; and in that it prohibits the doing of the acts specified in said statute when done by an officer, agent, teller, or clerk of any bank, and every individual banker or agent, teller, or clerk of any individual banker, while all other persons can do the acts therein prohibited.

VIII. The said statute violates the said provisions of article IV, section 2, of the Constitution of the State of Nevada, in this, that the acts prohibited by said statute are such acts as may be committed by other persons with the same degree of turpitude as by the persons enumerated in said statute, and a general law could be made applicable to prohibit the said acts.

IX. Said statute violates the said provisions of article IV, section 20, of the Constitution of the State of Nevada, in this, that it provides a special punishment for the crime of embezzlement by the persons enumerated in said statute, when, at the same time, the general law of the State of Nevada provides for the punishment of embezzlement when committed by other persons, which general law provides a different pun-

ishment from that provided in said statute; and in that the said statute provides a punishment when the acts specified in said statute are done by the persons therein enumerated, and does not provide a punishment for the same acts when done by any other person or persons than those so enumerated.

*R. C. Stoddard*, Attorney-General, *L. B. Fowler*, Deputy Attorney-General, *P. A. McCarran*, and *E. E. Roberts*, District Attorneys, for the State.

By the Court, Norcross, C. J.:

Counsel for petitioner in their brief say: "In presenting the constitutional questions we will follow these lines: That the business of banking, including the contract with depositors of the bank for every nature of deposits, is a lawful business, in which it is the inherent right of every citizen to engage; that the legislature can only regulate such a business, or the making of such a contract in the absence of fraud or turpitude; that its power to prohibit commences and ends with the fraud or turpitude; that the statute of Nevada prohibiting the receipt of deposits is not predicated upon fraud, and it therefore prohibits an act which it is the inherent right of every person to do; that the court has not power to read into the statute the element of fraud, which must be read into the statute to sustain its constitutionality; that if the court can read into the statute the element of fraud, to wit, a false pretense, then the statute violates the provisions of the Constitution of Nevada, inhibiting any special law for the punishment of crimes or misdemeanors; that the statute is class legislation and denies the equal protection of the laws; that the law is a special law, under the Constitution of Nevada, in a case where a general law could be made applicable."

That the business of banking is a lawful business in which it is the inherent right of every citizen to engage will not be questioned. It is a business, however, with which the general public welfare is most clearly identified. Money is said to be the very life-blood of the nation. The banking business has grown to be a part and parcel of our financial system, and is so regarded by both the federal and state governments. The

great bulk of business transactions, instead of being effected by an actual transfer of money, is accomplished through the medium of bank checks and drafts. Indeed, it would be next to impossible to carry on the great business transactions of this country, which aggregate hundreds of billions of dollars annually, without the aid of a well-organized banking system. It needs no extended argument to establish the fact that the banking business is in a class by itself. The assertion of the fact should be sufficient. While the business of banking may not be prohibited, it may be regulated, and it is of the highest importance to the public welfare that it be regulated by wise legislation. It is a matter of common knowledge that the deposits in the banks of the country exceed many times the total amount of actual money within the country. The solvency of the banks of the country must of necessity rest upon the value of their securities, rather than upon the actual amount of cash which may be within their vaults, very much the same as the wealth of the nation or state is represented, not merely by the amount of money within the treasury or in circulation among the people, but mainly upon the vast resources of the country of every character and description.

Common experience has abundantly demonstrated that the prosperity of the country is very largely influenced by public confidence in its banking institutions. Anything which tends to shake that confidence and causes depositors in banks to withdraw their deposits, produces contraction in business, which may result, and at times has resulted, in panics which have brought ruin and disaster to thousands, and seriously affected the welfare and happiness of the public generally for greater or less periods of time. If a person or corporation engaged in mercantile pursuits for example should fail, the injurious results are limited. Such failure does not tend to shake confidence in the business soundness of other similar enterprises. The case is different with banking institutions. The suspension of a bank in any locality causes depositors in other banks in the same locality to become suspicious of the solvency of the bank with which they may be dealing. Withdrawals follow, and, if they are sufficiently numerous, a second bank may be forced to at least a temporary suspension.

Every bank suspension tends in a greater or lesser degree to shake confidence in other like institutions. If it happens to be a large and well-known bank which fails, the greater will be the extent of the injury which its failure will produce upon other banks, not only in the locality in which the suspended bank is situated, but also in distant places. Thus may be brought about a financial panic of nation-wide extent.

To regulate the banking business so as to reduce to a minimum failures in this branch of business enterprise is not only clearly within the powers of the legislative department of government, but it may also be said to be an imperative duty for the legislature to enact laws for the prevention, as far as possible, of bank failures. For this purpose most, if not all of the states have enacted laws for the inspection of banking institutions by state officials. Banks organized under the federal laws are for similar reasons examined by government officials. Other laws have been enacted, all with the same general end in view. A number of states have enacted statutes making it a crime to receive deposits into a bank after it is known that the bank is in an insolvent condition. The purpose of these penal statutes is not only to protect innocent depositors, but to deter banking officials from so conducting the business of the bank as to endanger its solvency. These statutes vary in form and effect in different states, but their purpose is the same. Prior to the act of 1907, *supra* (Stats. 1907, p. 414, c. 189), this state had no legislation of this character; the general laws making it a crime for any one to wrongfully convert to his own use the property of another applied to bank officials who embezzled bank funds, the same as they did to any person who might embezzle property or funds of another. Not until this act, however, was it attempted to make it an offense for an owner, officer, or employee of a bank to receive a deposit into an insolvent bank, he knowing it at the time to be insolvent. Under the provisions of this act, although the official receiving the deposit may have no interest whatever in the bank, and although he may receive no personal benefit from the deposit, still he is made criminally liable, if at the time he has knowledge of the bank's insolvent condition.

Counsel for petitioner argues that, unléss a false pretense is read into the statute, no justification exists for penalizing the receiving of a deposit into an insolvent bank, and that a court has no power to read into the statute a false pretense. It must be conceded that a court has no legislative powers and cannot read into a statute something that is not within the manifest intention of the legislature as gathered from the statute itself. The function of a court, however, is to determine the intention of the legislature from the language used in accordance with the established rules of statutory construction. If it can be said that when a bank is opened and is doing business with the public that of itself is in effect a public declaration of solvency, then we can see no necessity of the legislature in passing a statute dealing with the subject to declare in the statute the existence of a state of facts which must be conceded to exist. A bank does business upon the confidence of the public in its solvency. When the public ceases to have such confidence, the suspension of the bank is inevitable.

In the case of *Baker* v. *State*, 54 Wis. 368, 12 N. W. 12, the court, considering a similar statute, said: "A bank implies capital, and capital invites confidence. A man holding himself out as banker or broker thereby gives public proclamation that he has money and property readily convertible into money in his possession and subject to his control, and for that reason he may be safely trusted. It requires no argument to show that such assurance is most inviting and influential with the mass of the people, especially with those unacquainted with the history and character of the man. With them the banker or broker is intrusted with money merely because he is a banker or broker, and hence supposed to have surplus capital as a standing guaranty of his agreements and his integrity. For an insolvent banker, company, or corporation to continue the business of banking is to hold out assurances of responsibility and surplus capital where neither exists. To do so knowingly is to secure the confidence, and hence obtain the money, of the ignorant and unwary by an implied deception. It is the old story of securing the victim by a display of false colors. To suppress this mischief,

to save the public from being induced to deposit money with such insolvent by the implied assurance of responsibility and wealth essential to the business, when they do not in fact exist, was the evident purpose of the statute."

See, also, *In re Koetting*, 90 Wis. 166, 62 N. W. 622; *State v. Shove*, 96 Wis. 1, 70 N. W. 312, 37 L. R. A. 142, 65 Am. St. Rep. 17; *In re Cook* (C. C.) 49 Fed. 833, 842.

In *Meadowcraft v. People*, the Supreme Court of Illinois, considering the statute of that state, said: "As said by the Supreme Court of Wisconsin in *Baker v. State*, 54 Wis. 368, 12 N. W. 12, a bank implies capital, and invites confidence. A man holding himself out as a banker thereby gives public proclamation that he has money and property readily convertible into money in his possession and subject to his control, and for that reason he may be safely trusted; and his business not only affects himself as a banker, but every person who deals with him as such. The object of the statute that is here challenged was evidently to protect the public from being induced to deposit money with insolvent bankers, and there are manifest reason and necessity for protecting the community in their dealings with persons engaged in the banking business that do not exist in respect to their transactions with those employed in the ordinary agricultural, manufacturing, merchandising and mining pursuits." (*Meadowcraft v. People*, 163 Ill. 56, 45 N. E. 303, 35 L. R. A. 176, 54 Am. St. Rep. 477.)

See, also, *State v. Darrah*, 152 Mo. 522, 54 S. W. 226; *McClure v. People*, 27 Colo. 358, 61 Pac. 612; *Robertson v. People*, 20 Colo. 279, 38 Pac. 326; *State v. Beach*, 147 Ind. 74, 43 N. E. 949, 46 N. E. 145, 36 L. R. A. 179.

In the case of *Commonwealth v. Rockafellow*, 163 Pa. 139, 29 Atl. 757, considering the case of a defendant convicted for the violation of a statute very similar to ours, and which statute, hereinafter quoted, makes no reference to fraud or false pretense, the court said: "The offense clearly and distinctly defined is the fraudulent receipt of the money of a depositor."

A bank of necessity must do business with the public upon its virtual declaration of solvency. The legislature, within the lawful exercise of its police power, can impose a penalty for

the conduct of such business when such bank or banker is in fact insolvent. The contention that this statute violates the provisions of the Constitution of this state inhibiting any special law for the punishment of crimes or misdemeanors, and that it is class legislation, is without merit. This court has repeatedly held that the legislature may enact laws which apply only to certain classes, if the basis for the classification is reasonable. (*Pyramid L. and L. Co.* v. *Pierce*, 30 Nev. 237; *Ex Parte Boyce*, 27 Nev. 299; *State* v. *Cal. M. Co.*, 15 Nev. 249.)

Judge Cooley treating this subject in his work on Constitutional Limitations, at pages 482, 483, says: "The legislature may also deem it desirable to prescribe peculiar rules for the several occupations, and to establish distinctions in the rights, obligations, duties, and capacities of citizens. The business of common carriers, for instance, or of bankers, may require special statutory regulations for the general benefit, and it may be a matter of public policy to give laborers in one business a specific lien for their wages when it would be impracticable or impolitic to do the same for persons engaged in some other employments. If the laws be otherwise unobjectionable, all that can be required in these cases is that they be general in their application to the class or locality to which they apply, and they are then public in character, and of their propriety and policy the legislature must judge." "Laws which regulate criminal prosecutions and proceedings or provide that acts done by certain classes of persons shall be crimes and state the punishment therefor are valid as applying to all of a class, where the classification is based upon a reasonable distinction; and it is for the legislature, and not the courts, to decide what is a reasonable distinction; the courts being able to hold a law unconstitutional only when the classification is based on purely statutory grounds." (8 Cyc. 1055, and authorities cited.)

In the case of *Gulf R. R. Co.* v. *Ellis*, 165 U. S. 150, 17 Sup. Ct. 255, 41 L. Ed. 666, the Supreme Court of the United States said: "It is not within the scope of the fourteenth amendment to withhold from the states the power of classification, and, if the law deals alike with all of a certain class, it is not obnoxious to the charge of a denial of equal protection.

While, as a general proposition, this is undeniably true, yet it is quite true that such classification cannot be made arbitrarily. The classification must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis. 'Classification for legislative purposes must have some reasonable basis on which to stand. It must be evident that differences which would serve for a classification for some purposes furnish no reason whatever for a classification for other legislative purposes. The differences which will support class legislation must be such as in the nature of things furnish a reasonable basis for similar laws and regulations.'" We think it manifest that there is a reasonable basis for such a classification as is made by the statute in question.

In the case of *Easton* v. *Iowa*, 188 U. S. 220, 23 Sup. Ct. 288, 47 L. Ed. 452, a case involving the conviction of a president of a national bank under the Iowa statute, the Supreme Court of the United States said: "Undoubtedly a state has the legitimate power to define and punish crimes by general laws applicable to all persons within its jurisdiction. So, likewise, it may declare, by special laws, certain acts to be criminal offenses when committed by officers or agents of its own banks and institutions. But it is without lawful power to make such special laws applicable to banks organized and operating under the laws of the United States." See, also, *Dreyer* v. *Pease* (C. C.) 88 Fed. 878.

In the case of *Baker* v. *State, supra*, which was decided in 1882, the Wisconsin court mentions the States of Illinois, Iowa, Kansas, Louisiana, California, Missouri, South Carolina, and Michigan as having statutes of this character, and says: "These statutes like our own are of recent date, and we are not aware of the constitutionality of any of them having been brought in question in any court; but the extent of the legislation seems to indicate a pretty general belief in the legislative power." To the foregoing list of states may be added many others, but in all cases where the constitutionality of these statutes have been raised so far as we are aware they have in every instance been sustained. In a number of cases

where convictions have been considered under acts of this
character no constitutional questions appear to have been
raised.

A case to which our attention has been called, but which,
we think, can hardly be regarded as exceptional, is that of
*Carr* v. *State*, 106 Ala. 35, 17 South. 350, 34 L. R. A. 634, 54
Am. St. Rep. 17. The act in question in that case made it a
misdemeanor for the president, cashier, or other officer of a
bank, etc., to receive a deposit, knowing or having good cause to
believe that the bank is in a failing condition. For such an
offense a fine was imposed of not less than double the amount
of the deposit, one-half of which should go to the person who
made the deposit. A further section provided that the pay-
ment back to the depositor of the amount of the deposit
before conviction together with costs "shall be a good and
lawful defense to any prosecution under this act." A brief
excerpt from the opinion will serve to distinguish this case
from other cases, although it is manifest, we think, that the
Alabama statute under consideration differs materially in
character from those adopted in other states to which our
attention has been called:

"There cannot be two opinions as to the intent and mean-
ing or the effect upon the whole enactment of this last and
most remarkable provision. It is a declaration of the baldest
and the most direct character to one party to a transaction
whereby he has incurred a debt to the other in the name of
the state that, unless he has paid that debt, he shall be
arrested, held to trial, tried, convicted, fined and imprisoned
at hard labor, and this obviously not for any taint of crim-
inality in the transaction out of which the debt arose, but
purely and simply for the nonpayment of the debt. For this
default, and until it is purged either by simply paying the
debt and accrued costs before conviction or by working out
double the debt and costs, the debtor may be imprisoned for
an indefinite time before trial merely and only because he
does not pay the debt and expenses of putting this coercion
upon him, there being no pretense of even ultimately punish-
ing him for taking the deposit, if the preliminary imprison-

ment shall have the desired effect of extorting the money he owes the depositor out of him.   *   *   *"

This statute was held unconstitutional because it violated the provisions of the Alabama Constitution inhibiting imprisonment for debt, which constitutional provisions, however, differ from ours, in that the Nevada Constitution makes an exception in cases of fraud, libel, or slander, while the Alabama Constitution makes no exceptions.   The Pennsylvania statute heretofore referred to provides: "That any banker, broker or officer of any trust or savings institution, national, state or private bank, who shall take and receive money from a depositor with the knowledge that he, they or the bank is at that time insolvent, shall be guilty of embezzlement and shall be punished by a fine in double the amount so received, and imprisoned from one to three years in the penitentiary." Laws Pa. 1889 (P. L. 145).

In a note to the case of *Commonwealth* v. *Junkin*, 170 Pa. 194, 32 Atl. 617, 31 L. R. A. 124, we find: "In *Commonwealth* v. *Smith*, 31 Lanc. Law Rev. 350, the Pennsylvania act of May 9, 1889, was attacked as unconstitutional, but the court, without directly passing upon the question, upheld the indictment, thereby implying that the statute was constitutional."

In the case of *Commonwealth* v. *Rockafellow, supra*, the conviction of a private banker was sustained under the act.   The question of its constitutionality, however, was not brought in question.   The court said: "The indictment charges that the defendant, being a banker and knowing he was insolvent, received money from a depositor.   The averment in the indictment follows the language of the act, and is in substantial compliance with the rules of criminal pleading.   The offense clearly and distinctly defined is the fraudulent receipt of the money of a depositor.   The act is not to be nullified because this is called embezzlement, and by a construction which reads into its provisions the definition of that offense. The word was not well chosen, but the intention is clear."

See also the case of *Commonwealth* v. *Hazlett*, 14 Pa. Super. Ct. 352.

The statute of this state is identical with, and was doubt-

less copied from, the California statute adopted February 14, 1872, excepting that the California statute makes the offense only a misdemeanor. (Cal. Penal Code, sec. 562.)

Our attention has not been called to, nor have we been able to find, any decision by the California courts based upon this statute.

A very careful and extended consideration of the able and exhaustive argument of counsel for petitioner fails to convince us that the act in question is violative of any constitutional provision. Our conclusion is to the contrary.

No valid reason appearing for the discharge of the said T. B. Rickey, it is ordered that he be remanded to the custody of the sheriff of Ormsby County, to take effect Monday, February 1, 1909, at 2 o'clock p. m., subject to the further order of the court.